**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
------------------------------x
                              :
EMMA JONES, as Administratrix :
of the Estate of Malik Jones  :
and as Guardian Ad Litem for  :
Priya Jones,                  :
                              :
        Plaintiff,            :
                              :
    v.                        :        No. 3:99CV00632(AWT)
                              :
TOWN OF EAST HAVEN, et al.,   :
                              :
        Defendants.           :
                              :
------------------------------x
```

<u>**RULING ON PENDING MOTIONS**</u>

Defendant Town of East Haven (the "Town") has filed a renewed motion for judgment as a matter of law, and for the reasons set forth in Part I below, that motion is being denied. Plaintiff Emma Jones has filed a "motion for hearing on compensatory damages," which included a request for a new trial on compensatory damages, and for the reasons set forth in Part II below, that motion is being granted. The Town has filed a motion to set aside the jury's award of punitive damages against it, and for the reasons set forth in Part III below, that motion is being granted. Finally, the court includes, in Part IV below, a written summary of its findings on the plaintiff's <u>Batson</u> claims.

**I. RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

Defendant Town of East Haven has renewed its motion, pursuant to Fed. R. Civ. P. 50, for judgment as a matter of law

on the plaintiff's <u>Monell</u> claim.  For the reasons set forth below, the renewed motion for judgment as a matter of law is being denied.

## A.  **Legal Standard**

The standard governing motions for judgment as a matter of law pursuant to Rule 50 is well-established.  Such a motion should not be granted "unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in [the opposing party's] favor." <u>Galdieri-Ambrosini v. National Realty & Dev. Corp.</u>, 136 F.3d 276, 289 (2d Cir. 1998); <u>Davis v. Rodriquez</u>, 364 F.3d 424, 432 (2d Cir. 2004).  The court deciding a Rule 50 motion "must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence." <u>Galdieri-Ambrosini</u>, 136 F.3d at 289 (citations omitted); <u>Advance Pharmaceutical, Inc. v. U.S.</u>, 391 F.3d 377, 390 (2d Cir. 2004) ("[i]n assessing the sufficiency of the evidence to support a jury verdict, we must view the record in the light most favorable to the opposing party, assuming all reasonable inferences were drawn and all credibility disputes resolved in its favor").  Accordingly, judgment as a matter of law should not be granted unless: (I) "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have

been the result of sheer surmise and conjecture," or (ii) "there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [the movant]."  Galdieri-Ambrosini, 136 F.3d at 289 (citations omitted); Mattivi v. South African Marine Corp., "Huguenot,", 618 F.2d 163, 168 (2d Cir. 1980); see also Cross v. New York City Transit Authority, 417 F.3d 241, 248 (2d Cir. 2005) (noting that "[a] movant's burden in securing Rule 50 relief is particularly heavy after the jury has deliberated in the case and actually returned its verdict" and pointing to (I) and (ii) as set forth in Galdieri-Ambrosini as the only grounds for setting aside the verdict under those circumstances).  "In other words, a Rule 50 motion must be denied unless 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.'"  Cross, 417 F.3d at 248 (citations omitted).

### B.  **Factual Background**

The evidence at trial included evidence with respect to the East Haven Police Department (the "EHPD") and testimony by and other evidence pertaining to the chief of police in 1997.  It also included evidence pertaining to an incident involving an individual named Shane Gray; comments made to an individual named Donald R. Jackman; the wearing of racially offensive T-shirts by

members of the EHPD; the shooting of Malik Jones; actions by
other EHPD officers immediately following that shooting; and
incidents involving an individual named Patricia Snowden.

### 1. The EHPD

In 1997, James Criscuolo was the chief of the EHPD, having
been appointed chief in 1993.  There were approximately 52
members of the department.  In terms of vehicles, the EHPD had 11
marked units, six unmarked units, and two police vans.  These
vans were used both for prisoner transport and for patrol.  The
Town had a minority population of approximately 1.4%, and the
EHPD was all white.  Several communities along the shoreline east
of New Haven were also predominately white.

The EHPD had three staggered shifts.  There was an 8 a.m. to
4 p.m. shift, and some people on that shift worked 7 a.m. to
3 p.m.  There was a 4 p.m. to midnight shift, and some people on
that shift worked 3 p.m. to 11 p.m.  Finally, there was a
midnight to 8 a.m. shift, and some people on that shift worked 11
p.m. to 7 a.m.  Depending on the particular evening, there were
five to eight people working from 4 p.m. to midnight and two
people working 3 p.m. to 11 p.m. on the evening shift.  This
included the shift commander, who would be a lieutenant or
sergeant, the dispatcher, and detectives.  Typically, there would
be five to six marked units patrolling during the evening shift.

The Town encompasses approximately 14 square miles, and it

is bordered on the west by New Haven, on the south by the Long Island Sound, on the east by Branford and North Branford, and on the north by North Haven.  The EHPD had four geographic sectors for patrol purposes.  The Town is longer than it is wide, and the southern patrol sector is bordered by New Haven, the Long Island Sound, and Branford; the center patrol sector is bordered by New Haven and Branford; the north patrol sector is bordered by New Haven, Branford, and North Branford; and the upper north patrol sector is bordered by New Haven, North Haven, and Branford.  The New Haven Municipal Golf Course (the "Golf Course"), which lies mostly in East Haven, straddles the New Haven/East Haven line, and there is no thoroughfare through the Golf Course.

Chief Criscuolo, who had commanded the patrol division from 1985 to 1992, testified that EHPD officers patrolled those sectors and that there was no policy, written or unwritten, of patrolling the borders between New Haven and East Haven.  Chief Criscuolo testified that the EHPD had both written and unwritten policies.  He also told the jury that, while he was chief of police, he was aware that other communities were talking about the issue of racial profiling, but the EHPD did not have that problem, and he concluded that it was not necessary to address that issue.  Chief Criscuolo testified that there was no EHPD policy against discriminating against people based on race.

Chief Criscuolo testified that no African-American

individual had ever filed a formal complaint or lawsuit against the EHPD alleging excessive force.  Joseph A. Pascarella, who was chief of police from 1964 to 1993, testified that, to his knowledge, no one ever claimed they had been mistreated because of his or her race during his tenure as chief.

The EHPD had a formal, written policy on use of deadly force and use of firearms.  It was promulgated under the authority of Chief Pascarella.  The policy provides, in part:

> \*        \*        \*
>
> B.  Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.  A police officer may not seize an unarmed non-dangerous suspect by shooting him.
>
> C.  Where the officer has probable cause to believe that the suspect poses a threat of deadly physical harm either to the officer or to others, it is permissible to use deadly physical force to defend himself or a third person to prevent escape by using deadly physical force.  Thus, if the suspect threatens the officer or another with the use of deadly physical force or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly physical force may be used if necessary to defend himself or another, or to effect an arrest or to prevent escape, and if, where feasible, some warning has ben given.
>
> POLICE OFFICERS SHALL NOT USE DEADLY FORCE IN ANY OTHER MATTER INVOLVING A MISDEMEANOR OR TRAFFIC VIOLATION.
> \*        \*        \*
> F.  <u>MOVING VEHICLES</u>
>
> Discharging a firearm from or at a moving vehicle is <u>prohibited</u>, unless the occupants of the other vehicle are using deadly physical force against the officer or another person.

(Defendant's Ex. 47).

## 2.    The Shane Gray Incident

The plaintiff introduced evidence from which the jury could have reasonably concluded that on September 15, 1991, Officer Flodquist used excessive force in taking Shane Gray into custody and that, while the EHPD conducted a routine inquiry into Flodquist's discharge of his weapon, that inquiry was deficient and the EHPD ignored and did not investigate at all Gray's complaint that Flodquist used excessive force.

It was undisputed that at approximately 9:15 p.m. that night an East Haven resident, Nicholas Pappacoda, was robbed by three black males in their twenties while trying to buy drugs on Eastern Circle in New Haven.  New Haven police were called to the scene.  At 11:34 p.m., the New Haven Police Department sent out a bulletin to surrounding police departments that three unknown black males in their early twenties, who were wearing dark clothing, were wanted for robbery with a firearm.  The bulletin stated that the incident occurred on Eastern Circle in New Haven, that a silver handgun was displayed, and that gunshots were fired.  The bulletin stated that the perpetrators fled in an light blue Oldsmobile Sierra and gave the license plate number. The EHPD dispatcher promptly relayed the information in the bulletin to the EHPD units on patrol.  Flodquist testified that there would have been at least five units on patrol at that time.

Eastern Street runs north/south in the City of New Haven,

somewhat parallel to the New Haven/East Haven town line.  The southern end of Eastern Street crosses the town line, at which point it becomes Laurel Street in East Haven.  The northern end of Eastern Street terminates at Quinnipiac Avenue.  The last major intersection prior to Quinnipiac Avenue is Route 80, also known as Foxon Road in East Haven and Foxon Boulevard in New Haven.  Foxon Boulevard is the first major road crossing the New Haven/East Haven town line north of the Golf Course.  If one proceeds from East Haven to New Haven on Foxon Road, turns south at the intersection of Foxon Boulevard and Eastern Street, one eventually arrives at the southern end of Eastern Street and crosses into East Haven, at which point the road becomes Laurel Street.  Eastern Circle lies to the east of Eastern Street, is in the shape of a half-circle, and has a southern and a northern intersection with Eastern Street.  Eastern Circle lies entirely within the City of New Haven.

Shane Gray testified that he exited his residence on Eastern Circle that evening and saw two Hispanic teenaged brothers from next door taking joyrides in a car on Eastern Circle.  When Gray asked if he could take the car for a ride, they let him do so.  Gray got into the car and drove towards the northern intersection of Eastern Circle with Eastern Street.  As Gray approached Eastern Street, he saw two EHPD cruisers sitting there on Eastern Street, side by side but facing in opposite directions.  The two

cruisers were blocking the road. Gray panicked and jumped out of the car while it was still moving. The car continued on and crashed into a wooden guard rail next to a parking lot on the northern side of Eastern Circle. Gray ran through the parking lot and out into an open field. Officer Flodquist pursued him in one of the EHPD cruisers.

Also, Gray testified that the cruiser that chased him across the field had not been behind him as he was driving around Eastern Circle. He told the jury that before he saw the two EHPD cruisers parked at the northern intersection of Eastern Street and Eastern Circle, he had not seen any police car at all.

Officer Flodquist's version of how he came to be pursuing Shane Gray across the open field was quite different. Flodquist testified that when the EHPD dispatcher broadcast the information about the robbery on Eastern Circle, he informed the dispatcher that he would check both town lines in the vicinity of Eastern Circle. Flodquist testified that he first checked the New Haven/East Haven town line at the Route 80 end; Flodquist's case/incident report states that the robbery occurred in New Haven on Route 80 near Quinnipiac Avenue. He then went south on Eastern Street and checked the town line at the Laurel Street end. Flodquist testified that Eastern Street was in his normal course of patrol. Flodquist testified that he then observed a blue Oldsmobile heading south on Eastern Street, and that the

driver made a sudden U-turn, and that when the car turned around Flodquist saw that it had the marker plates that were reported in the recent broadcast as belonging to the car that had been stolen during the robbery. Flodquist testified that he pursued the vehicle a short while north on Eastern Street, into the southern entrance to Eastern Circle, and around Eastern Circle. He testified that his pursuit of the vehicle was very brief, lasting seconds, not minutes. Flodquist also testified that during the pursuit he activated his lights and sirens and he told the EHPD dispatcher that he was in pursuit of the vehicle, and that he had attempted to pull the vehicle over. He testified that near the northern entrance to Eastern Circle, the driver jumped out of the car while it was still moving. The car continued on and crashed into a wooden guard rail next to a parking lot while the driver ran through the parking lot and out into an open field, with Officer Flodquist in pursuit, driving his EHPD cruiser.

Flodquist testified that he had no communication with Officer Kevin McCarthy prior to pursuing Gray and that at no time while he was pursuing Gray's vehicle that night did he see the EHPD cruiser being driven by McCarthy. He could not say whether McCarthy's cruiser arrived on the scene before or after the automobile driven by Gray hit the guardrail. The plaintiff introduced into evidence the report of the New Haven police officer who investigated the crash of the Oldsmobile into the

guard rail.  Officer McCarthy told that New Haven officer that McCarthy was in his vehicle on Eastern Street, at the northern intersection of Eastern Circle with Eastern Street, and Gray was driving the Oldsmobile towards him when he suddenly slowed the vehicle and jumped out of the car.  The car then went out of control and slammed into the wooden guard rail.  The report contains no indication of how McCarthy came to be at the scene and no indication that he was aware of Flodquist pursuing Gray on Eastern Street and around Eastern Circle.

During Flodquist's deposition, he had testified that, once Gray jumped out of the automobile and started running, he pursued Gray in his cruiser, instead of on foot, because there were no other officers on the scene at the time and, in that situation, Flodquist did not want to run out in to a field after an armed person without cover.  However, at trial, Flodquist conceded that although he could not say exactly when McCarthy arrived at the scene, he knew at the time he was pursuing Gray across the field in his cruiser that he was not alone at the scene; specifically, he knew that McCarthy was in close proximity.  He also testified that it was his intention to get past Gray.

The jury also heard very different accounts from Gray and Flodquist as to what happened during the pursuit across the field.  Gray testified that as he ran across the field, Flodquist's cruiser caught up with him "real fast."  When

Flodquist's cruiser caught up with Gray, it hit Gray and he flipped onto the hood of the cruiser. The cruiser kept going and slid into a ditch. At that point, Gray rolled over, fell off the car, jumped up, and ran. When Gray looked back, Flodquist was still in the cruiser. Without saying "freeze" or anything else, Flodquist shot at Gray. Gray ducked his head and kept running. Gray ran to a neighboring building, knocked on the door, and laid down on the porch. Officers arrived at the porch, placed Gray in handcuffs, and proceeded to take Gray to an EHPD cruiser in the parking lot.

Gray's relatives and other residents of neighboring homes had come outside at the scene, and Gray told them that the officer had hit him with his car and also had shot at him. Gray refused to let the officers place him in the EHPD cruiser until his aunt arrived and calmed him down. At that point, Gray was yelling loudly enough to be heard by everyone at the scene, including all of the police officers on the scene, that Flodquist had hit him with his car and had shot at him. There were both New Haven and EHPD officers at the scene at this time. Gray testified that at no time that day did he have a gun.

Gray testified that he was so mad about being hit by Flodquist's cruiser and about being shot at that he called the officers every name he could think of and that, if he could have gotten the handcuffs off, he would have attacked the officers.

He testified that after he had been transported to EHPD headquarters, he continued to be mad. When he was taken to the desk at the station, he was yelling at whomever was around that Flodquist had shot at him and hit him with his car and that his side hurt. Gray testified that there were three or four EHPD officers around the desk at that time and that these officers were different from the ones Gray complained to at the scene of the incident.

Gray told EHPD officers at the station that he needed to go to the hospital because he had been hit by Flodquist's cruiser. The East Haven Fire Department was called and a paramedic checked Gray at approximately 1:53 a.m. Gray was subsequently taken to Yale New Haven Hospital, where he was treated in the emergency room. At the hospital, Gray complained of pain in his left buttock, and he told the staff that he had been hit by a police car at a moderate speed and thrown onto the hood. The hospital staff noted that Gray had a contusion on his left hip. Gray was discharged from the hospital at about 3:40 a.m. and returned to EHPD headquarters. At about 4:40 a.m., Gray was released on a $2,500 bond, having been charged with larceny, carrying a pistol without a permit, interfering with police and reckless endangerment.

Flodquist told the jury that as he pursued Gray across the open field, his cruiser was not directly behind Gray, but rather

Gray was in front of the cruiser but off to the left.  When Flodquist wrote up his case/incident report, he stated that when he drove up on the grassy area, he saw that the suspect had "an object" in his right hand while he was running.  However, when Flodquist testified, he stated that when he saw Gray jump out of the car and start running away, Gray had a chrome object in his hand and that as Flodquist got closer to Gray, he could see that it was a gun.  When challenged as to how he could see that the object was a gun from approximately 50 feet away at 11:30 or so at night in the dark, Flodquist testified that he could see that it was a gun because he had all of his lights on as he was chasing down Gray.

Flodquist testified that he then saw Gray disappear and realized that the cruiser was approaching a ditch, at which point he applied his brakes and the cruiser slid.  As the cruiser slid down the embankment into the ditch, Flodquist saw Gray going up the far side of the ditch.  Flodquist testified that he opened the driver's door of his cruiser and shouted for Gray to stop.  Gray, who was on the far side of the ditch, turned towards Flodquist.  Flodquist testified that he saw a small chrome gun in Gray's right hand.  Before Gray could raise it, Flodquist, having already drawn his weapon, fired two shots at Gray while leaning on the cruiser door for support.  Gray fell to the ground and then got up and ran away.

Flodquist testified that he then pursued Gray to the porch of a nearby residence approximately 200 yards away, where he took Gray into custody at gunpoint and placed handcuffs on him. Flodquist then escorted Gray to Officer Peterson's EHPD cruiser, which was parked on Eastern Street. No gun could be found on Gray's person or on the ground where he had been handcuffed. Flodquist conceded that once Gray stood up and while he was running away from the ditch to the porch, Flodquist always had Gray in sight and he did not see a gun in Gray's hand; nor did he see Gray throw a gun away.

A search of the entire area was undertaken by the New Haven and EHPD officers at the scene, but no gun was ever found. Flodquist testified that someone in the crowd must have taken the gun, although he saw no one take it. He wrote in the case/incident report that several persons in the crowd that gathered in the apartment complex were laughing and saying, "Don't bother looking for the gun, you won't find one now." However, Flodquist conceded that he had said or done nothing that would have alerted anyone in the crowd to the fact that he was claiming that he saw Gray with a gun. He also agreed that he was the only police officer who claimed to have seen a gun. Also, when Flodquist testified at trial concerning comments from the crowd about not finding the gun, he indicated that a person from the crowd, who was over near Flodquist's cruiser, yelled out the

comment about not bothering to look for the gun and added something like "white boy."

Flodquist testified that he was positive that at no time did his cruiser ever strike Gray and that Gray never rolled up onto the hood of his cruiser. He also testified that Gray never told him that Gray had been hit by Flodquist's cruiser. Flodquist's case/incident report does, however, state that he attempted to stop the cruiser as it caught up with Gray and it began skidding on the wet grass; that Flodquist had already unfastened his seat belt and had his weapon in his hand; and that "the cruiser, officer and suspect went into a large drainage ditch." It also notes that Gray was complaining of pain in his buttocks.

In testifying about this incident, Flodquist disagreed that the EHPD's procedure was that when a crime is committed in New Haven, it would be a New Haven arrest, even if the arrest was made by EHPD officers. Chief Criscuolo had testified if an individual committed a crime in New Haven but was apprehended by the EHPD, the procedure would be to turn the suspect over to the New Haven police, even if the person was apprehended in East Haven by the EHPD.

At the time Flodquist placed Gray in handcuffs, no New Haven officer had arrived on the scene. The only officers there were EHPD officers. When Sgt. DaCosta of the EHPD arrived at the scene, he took possession of Flodquist's weapon because that was

16

part of the procedure to be followed when shots are fired by an EHPD officer. An internal investigation into whether the discharge of the weapon was justified was also part of that procedure. The internal investigation was conducted by Captain Criscuolo, who was Chief of the EHPD in 1997, and Flodquist testified that the conclusion was that his actions were justified. Gray testified that he was never contacted by anyone from the EHPD about the incident.

A report of the investigation of Flodquist's firing his weapon at Gray was prepared. That report was destroyed by the EHPD's keeper of records in accordance with state regulations. However, the EHPD cell card for Shane Gray from the night of the incident had not been destroyed. The cell card is a document that is created and time-stamped when a prisoner arrives in detention. Then additional events, such as when a prisoner makes a telephone call, and the time of the event, are also recorded. Flodquist agreed that if Gray had made a complaint, one could expect to see it on the cell card. When Flodquist was asked by plaintiff's counsel whether Gray's cell card was available, he initially testified that he did not know whether it was or not. Later in the questioning, Flodquist was asked where he had gotten very specific times he gave in his testimony as to when certain events happened during Gray's stay at the station. It came out that Flodquist had gotten the times by reviewing a

copy of Gray's cell card.  When the cell card was later
introduced into evidence, it contained no record of any complaint
by Gray--just a notation by Flodquist that the Fire Department
had been called to check the prisoner.

During Flodquist's pretrial deposition, he remembered Shane
Gray's name without being prompted, and he volunteered, without
being asked, that Gray was deceased.  When asked how he knew that
Gray was deceased, Flodquist stated that an investigator from the
State's Attorney's Office had called him a few weeks or months
after the incident and told him Gray had been the victim of a
homicide in New Haven.  Flodquist also told the plaintiff's
counsel during the deposition that he thought Gray was a juvenile
at the time of the incident, and at trial he agreed that he knew
that juvenile records are not available to the public; Gray was
21 at the time of the incident.  Flodquist also testified during
his deposition that he thought the incident happened sometime
around 1986 or 1987; Flodquist was notified that he had been
hired by the EHPD in February 1985.

### 3.   Comments to Jackman

Donald R. Jackman testified about a comment made by a member
of the EHPD in the presence of three other officers, on
January 8, 1996, to the effect that Jackman would have been
treated differently had he been African-American instead of
white.

18

Jackman, who had had a previous encounter with the EHPD, made a series of telephone calls to the EHPD late on the night of January 7, 1996 and early in the morning of January 8, 1996. Jackman used insulting language during these calls. At approximately 1:00 or 2:00 a.m., a squad car was sent to Jackman's residence. Eventually four members of the EHPD were at the scene. Jackman refused to let the officers into his residence and refused to tell them whether he had a gun. When the four officers gained entry to Jackman's residence, a violent struggle ensued and they learned that Jackman did have a gun. Jackman bit one of the officers on the hand, causing a serious injury. Jackman testified that he was beaten about the face and head, had teeth knocked out, and needed stitches in his head.

Jackman testified that at the end of the struggle, he was facedown on his bed and one of the officers, who had his weapon to Jackman's head, said to Jackman, "You're lucky you're not a nigger because you'd be fucking dead" and "[i]n three days you will be in Whalley being butt fucked by the niggers.." (Transcript, June 5, 2003, at 15). At the time, Jackman did not know what "Whalley" was, but he subsequently learned that it was a jail in New Haven.

The four members of the EHPD who were involved in the Jackman incident were Sgt. Daniel Gihully, and Officers Robert Nappe, Joseph Peterson and Ed Vecellio. Nappe testified at trial

that neither he nor any of his fellow officers made any comment
of the type claimed by Jackman.

### 4.   The T-Shirt Incident

The jury could have reasonably inferred that substantially
contemporaneously with, if not prior to, the Jones shooting,
certain members of the EHPD were wearing racially offensive T-
shirts in public.  The precise time period during which these T-
shirts were first worn is unclear, but the situation eventually
resulted in a May 27, 1997 memorandum from Chief Criscuolo and a
discussion at the regularly monthly meeting of the Board of
Police Commissioners that evening.

Chief Criscuolo testified that it came to his attention,
around the time of the Jones shooting, that some members of the
EHPD were wearing certain T-shirts while playing in softball
games, but the team on which these police officers played was not
an official EHPD team.  The T-shirts depicted police officers
holding suspects on the hood of a police car and contained a
reference to "boys on the hood."  Chief Criscuolo testified that,
even though he had never seen the movie "Boyz n the Hood," he
thought the T-shirts were in bad taste, and he agreed that they
were racially offensive to people of color.

Chief Criscuolo testified that the T-shirt situation was
brought to his attention by an individual he passed on the
street.  Criscuolo could not recall who this person was or even

whether the person worked for the EHPD.  Criscuolo testified that he expressed his own displeasure about the T-shirts and told the person that he wanted the situation stopped.  Criscuolo stated that making that statement to this particular person was, in his view, sufficient action on his part to address the situation.  In Criscuolo's view, the situation was insignificant so long as officers stopped wearing the T-shirts.

Criscuolo conceded that, as Chief of the EHPD, having learned about the T-shirt incident, it fell to him to do something in response.  He agreed that as chief of police he should take action if members of the EHPD were engaging in off-duty conduct that made it appear to the public that members of the department behaved in a discriminatory fashion.

Criscuolo testified that he did not conduct any investigation into the matter.  He took no steps to find out how many members of the EHPD were wearing the T-shirts.  He testified that he did not know whether it was ten, twenty, or some other number of officers.  Nor did Criscuolo take any steps to determine which members of the EHPD were wearing the T-shirts or how long they had been wearing such racially offensive T-shirts in public.  Criscuolo felt that he only wanted to know who had been wearing such T-shirts if the practice continued.  Criscuolo testified, however, that he conducted no inquiry within the department to determine if the wearing of the T-shirts had

stopped. He simply assumed that it had stopped because he was
not told it had continued.

Criscuolo testified that the T-shirts were a topic of
discussion around the town, and that he heard about them from
people in addition to that person he spoke to on the street and
told he wanted the situation stopped. Although Criscuolo never
asked to see one of the T-shirts, they were described to him and
he may have seen a depiction of them in a newspaper which ran an
article about the wearing of the T-shirts by members of the EHPD.

Detective Raccuia of the EHPD, who was president of the
police union, testified that certain members of the union--he
could not say how many--had been wearing the T-shirts. He
testified that there was no controversy when the T-shirts were
first acquired or worn. The T-shirts only became controversial
after an article appeared in a newspaper approximately one month
prior to May 27, 1997.

On May 27, 1997, Chief Criscuolo distributed the following
memorandum to the EHPD:

> It was recently brought to my attention that a Tee Shirt
> that appeared to be representing sponsorship by this
> Department was being worn by a baseball team comprising
> of some East Haven Police Officers.
>
> Before any display, inference of sponsorship or
> representation of the East Haven Police Department is
> used, permission must first be obtained from the Chief of
> Police.

(Defendant's Ex. 123). Criscuolo testified that he knew that the

Board of Police Commissioners was meeting on the night of May 27, 1997, but he could not recall if he knew that the subject of the T-shirts would be raised at the meeting.  The subject of the T-shirts was raised at the meeting.  The minutes of the meeting reflect that members of the media and citizens from New Haven were in attendance, in addition to the members of the Board.  The minutes reflect that the chairman of the Board commented that the T-shirt incident offended him and asked Chief Criscuolo if he had handled the situation, and that the Chief replied that he had.  The chairman stated that the incident was "unexcusable" and that the Board would take quick action if something like that ever happened again.  Another of the Board of Police Commissioners also commented that it was "intolerable."

As the plaintiff pointed out to the jury, Chief Criscuolo's memorandum made no mention of offensive T-shirts.

### 5.    The Jones Shooting

On April 14, 1997, at approximately 6:16 p.m., Officer Flodquist of the EHPD reported to the dispatcher that he was trying to catch up with a gray Oldsmobile Cutlass automobile that was eastbound on Route 1.  Approximately one minute later, Flodquist gave the dispatcher the license plate number of the automobile and informed the dispatcher that they were doing a U-turn and proceeding west on Frontage and that the driver was "taking off" on him.  At a little after 6:18, Flodquist reported

that he was pursuing two black males, westbound in a gray Cutlass, coming up to Saltonstall and Forbes and that they were going about 50 miles per hour.  At that point, Officer Gary DePalma joined the pursuit, pulling up immediately behind the Oldsmobile; Flodquist was immediately behind DePalma.  At approximately 6:19 p.m., the EHPD dispatcher informed the New Haven dispatcher that two EHPD units were inbound into New Haven, trying to stop an automobile.

The pursuit continued onto Interstate 95, and DePalma and Flodquist followed the Oldsmobile when it got off at Exit 2.  At that point, the EHPD dispatcher advised the New Haven dispatcher that they should know that if they approached the vehicle, there were "two black, uh, males within."  Eventually, DePalma and Flodquist pursued the Oldsmobile eastbound on Grand Avenue, where at 14 seconds after 6:21, Flodquist notified the dispatcher that they were eastbound on Grand Avenue, going at a slow speed and he thought the occupants of the Oldsmobile were looking to bail out.  At 31 seconds after 6:21, Flodquist reported that they were into a vacant lot at Murphy Road and Grand Avenue.  Officer Flodquist's next transmissions were at 9 seconds after 6:22 p.m., when he stated:  "45, there's an Officer involved here.  Need Signal One.  I've been hit by the vehicle," and at 32 seconds after 6:22 p.m., when he stated, "I've been struck by the suspect's vehicle on foot involved in a shooting."

The pivotal events in this case occurred in the short time between Flodquist's transmission at 14 seconds after 6:21 p.m. and his transmission to the dispatcher at 9 seconds after 6:22 p.m. The evidence considered by the jury included that summarized below.

As the Oldsmobile proceeded east on Grand Avenue, Malik Jones was driving and Samuel Cruz was in the front passenger seat. Jones turned left onto Murphy Road and lost control of the car. The Oldsmobile veered to the right into a vacant lot, and traveled in a semi-circle and exited the lot onto Grand Avenue, but now facing west in the westbound lane.

DePalma had begun to turn left onto Murphy Road, but when he saw the path being taken by the Oldsmobile, backed up and pulled back onto Grand Avenue near Flodquist's police van, still facing east. Flodquist had not tried to turn and had stopped on Grand Avenue, also facing east. The Oldsmobile came to a stop, its path forward blocked by the two EHPD vehicles.

Flodquist exited the police van and ran between his vehicle and the Oldsmobile to the driver's side door of the Oldsmobile. Witnesses described how Flodquist's face looked during this time, and the jury could have reasonably concluded that he was, at the least, extremely angry. Flodquist had his weapon out by the time he was between the police van and the Oldsmobile. Cruz testified that while Flodquist was between the police van and the

Oldsmobile, Jones, who had not turned off the car, shifted gears and put the Oldsmobile into reverse, but did not move the car. Jones' hands were on the steering wheel.

Flodquist testified that as he got out of the police van, he paused and stopped behind the driver's door of the van for 20 to 30 seconds. However, other witnesses testified that Flodquist immediately ran to the driver's door of the Oldsmobile. DePalma exited his cruiser, and he went to the passenger side of the Oldsmobile.

It is undisputed that after Flodquist arrived at the driver's side of the Oldsmobile, he used the butt of his gun to break the window in the driver's door. The glass shattered; some of it went into the car and some of it fell outside the car. It is also undisputed that at some point, the Oldsmobile moved backwards following a circular path, and Flodquist was directly in its path, and had he not kept moving backwards, he would have been struck by the car as it circled backwards.

The Oldsmobile moved in a circular fashion, through the open lot, and back onto Grand Avenue, where it came to rest against DePalma's cruiser. The driver's door of the Oldsmobile came to rest against the front left corner of DePalma's vehicle, and consequently that door could not be opened.

It was also undisputed that only four bullets were ever recovered and that four shell casings were found after the

halfway point on the circular path the Oldsmobile traveled from its starting point on Grand Avenue facing the police van to its final position against DePalma's cruiser.  At the time of the initial investigation, only three shell casings were located. The fourth shell casing was not found until four months later, when the Connecticut State Forensic Laboratory did a forensic reconstruction of the incident.  It was undisputed that Flodquist fired four shots after the halfway point on the circular path traveled by the Oldsmobile.

It was undisputed that Flodquist's weapon held 12 bullets, 11 in the clip and one in the chamber.  It was also undisputed that, after the incident, there were only seven bullets remaining in the weapon.  Flodquist testified that on March 24, 1997, he was dispatched to shoot a sick animal and fired one shot at that time and that he did not know whether he had reloaded his weapon between March 24, 1997 and April 14, 1997.

The defense contended that Flodquist only fired a total of four shots during the incident; that all four shots were fired after the halfway point on the circular path traveled by the Oldsmobile, while the Oldsmobile was moving toward Flodquist; and that when Flodquist shot Jones, he reasonably believed that he was in danger of being seriously injured or killed.  The plaintiff contended that Flodquist fired a total of five shots and that he fired the first shot immediately after breaking the

glass in the driver's door with his gun and before he ever believed he could not get out of the path of the Oldsmobile.

Based on the evidence submitted, the jury could have reasonably concluded that under the circumstances, the amount of force used by Flodquist exceeded that which a reasonable officer would have used in similar circumstances because the force used was not reasonably necessary to defend himself against the imminent use of force.

Flodquist gave written statements on April 14, 1997 and on April 22, 1997. His April 22nd statement contained more detail. In that statement, he stated that he exited the police van and took cover behind the driver's door and waited there for approximately 20 to 30 seconds, that he had drawn his weapon, that he had given commands to the occupants of the Oldsmobile several times, and that he saw that Jones had his hands on the steering wheel and Cruz was sitting still. Flodquist stated that he concluded that the pursuit was over and that it was time to take the driver into custody, so he approached the driver's side, continuing to give loud commands not to move. The April 22nd statement continues:

> I positioned myself at the driver's side door area, just forward of the door hinge and to the rear of the left front tire. I saw the operator's right hand come off the steering wheel and his left hand turn the wheel to the right. Both his movements were very quick. At the same time, the car started to accelerate quickly with the left front tire turned towards me. I reacted by striking the driver's window with a sweeping motion with my right hand

and the butt of my service weapon.  I am not sure if the
car struck me just before breaking the window or just
after.  The purpose in breaking the window was to stop
the operator from driving the car and striking me.  I was
going to turn the car off or grab the operator to do
this.  The operator of the gray Oldsmobile continued to
backup rapidly.  I continued to shout commands as the car
moved.  I had to move with the car to avoid being run
over by it . . . . If he had backed straight up, he could
have escaped without driving into my path.  The car made
contact with me several times and I tried to escape the
path.  I tried to escape but the car was going too fast.
I turned around to try to run away and saw the left tire
coming right at me.  Looking at the tire I thought I was
going to be killed or seriously injured.  Unable to
escape I continued to sidestep alongside the car and I
was scared for my life without any doubt whatsoever.  The
car was right on top of me.  The car struck me again and
I was thrown back.  This is when I fired the first shot.
By shooting at the operator I was trying to stop the
operator from accelerating and running me over.  The
first shot hit him in the left chest area.  The shot
appeared to have no effect on the operator and he gave me
a defiant, go to hell look.  He did not stop the car, it
continued to turn in to me.  The car continued to
accelerate and pick up speed.  I then fired several more
times after hesitating after the first shot.  I do not
recall how many more times I fired, but I stopped firing
when I saw the operator slump to the right and the car
slowed down.  I was now able to run towards the rear of
the car and out on an angle escaping its path.

(Plaintiff's Ex. 24, at 3-6).

Flodquist testified that although he was in a state of
heightened awareness and on alert, he was not angry or upset
during the incident.  He stated that his face could have been red
because he was yelling and he has a fair complexion.  Although he
had stated in his April 22nd statement that he was unsure about
the sequence of events, Flodquist testified that he banged on the
driver's window after the Oldsmobile struck him.  He also

29

testified that, although he could not be positive, he believed that he broke the window the first time he struck it.  Flodquist was bleeding from the head at the end of the incident.  He testified that he knows he was cut, but he does not know for certain what hit him, although he believed the cuts were from the glass shattering when the driver's window broke.

Also, Flodquist conceded that he did not try to get away from the Oldsmobile until after the window broke.  He testified that the first time he realized he could not get away was when the window broke, and that prior to that point, he tried to move with the car.

Flodquist testified that he did not fire the first shot until he was at least halfway around the circular path traveled by the Oldsmobile.  He also testified that he did not know how many shots he fired.  Flodquist conceded on cross-examination that if the Oldsmobile posed no risk of harm to him at the time he fired the first shot, then he was not justified in doing so.

Cheryl Bell testified that she was driving on Grand Avenue with her young son and had pulled her car over to the side when she heard sirens and saw police cars.  She stopped practically across the street from where the Oldsmobile was when Flodquist exited his police van.  Flodquist caught her attention when he jumped out of his van because he pulled his weapon and looked "flaming mad."  His face was bright red; Bell explained that he

looked "as mad as hell."  Bell testified that Flodquist ran to
the driver's side of the Oldsmobile, never pausing.  She stated
that he ran up to the car and immediately started banging on the
window.  Almost simultaneously with the second or third bang,
Bell heard a gunshot.  Bell testified that the entire incident
happened very fast and took about five seconds.

In addition, Bell testified when Flodquist was about two
steps from the driver's door, she saw the white lights in the
rear of the Oldsmobile go on, like a flash of the reverse lights.
She also testified that while it is possible the car was moving
when Flodquist broke the window, her recollection was that she
did not see it moving; she stated, however, that she was looking
directly at Flodquist.  After the first gunshot, Bell put her
head down on the steering wheel.  She testified that she did not
remember how many gunshots she heard after she put her head on
the steering wheel, but that she heard at least three or four
gunshots throughout the entire incident.

Edwin Velez testified that he was in slow-moving traffic on
Grand Avenue near Murphy Drive and that the three vehicles, i.e.
the Oldsmobile, DePalma's cruiser, and Flodquist's police van
were less than 100 feet in front of him.  He testified that,
before the window broke, while two officers were yelling at the
people in the car, the Oldsmobile went forward a little bit and
then backwards a little bit.  He stated that the Oldsmobile

started to move backwards again and the officer who was standing by the driver's window put his left hand on the hood of the car by the windshield area and the officer on the passenger side was kicking at the door. Velez testified that Flodquist banged on the driver's side window three times and that the first gunshot was fired by Flodquist immediately after he broke the window.

MacArthur Bethea lived on Grand Avenue and was at home at the time of the incident. Bethea testified that he first noticed the Oldsmobile because its engine was so noisy. He stated that he saw the Oldsmobile go into the vacant lot and that he saw the police van come to a stop and Flodquist jump out. He testified that he could see that Flodquist was in a rage because he was red. He stated that the Oldsmobile was coming to a stop, that Flodquist had his gun out, and that as Flodquist got to the car, the car was "into a stop" and Flodquist banged on the window. Bethea testified that the car was not moving towards Flodquist, but rather was going straight. Bethea also testified that when the window shattered, Flodquist shot immediately; he explained that the time between the shattering of the window and the shooting was "about a second, if that" and that he was about 25 to 30 feet from Flodquist at the time. Bethea testified that after Flodquist fired twice, Bethea left because of concern for his own safety. Bethea also testified that he then heard about three more shots and that, at that point, he came out of his yard

and went across the street, where he stayed for a short while until another EHPD officer arrived.  After the incident was over, Bethea observed that Flodquist was bleeding from his face.

Mark O'Connor was an off-duty police officer who was traveling east on Grand Avenue.  He pulled over to the side of the street at John Murphy Drive after being passed by the Oldsmobile, Flodquist's police van, and DePalma's cruiser. Called as a defense witness, O'Connor testified that he was possibly 50 feet away from where the Oldsmobile first stopped. He testified that he saw Flodquist leave the police van and go to the driver's side of the Oldsmobile and saw DePalma go to the passenger side.  He stated that for a few moments it appeared that the situation was over.  Then after a few moments, the Oldsmobile started to back up and it went into the field.  As it went into the field, he could see that Flodquist was running along with it.  He estimated that four or five seconds later, when the Oldsmobile had gone well back into the field, he heard four rapid shots.  At that point, he ducked down.

Flodquist's police van and DePalma's cruiser were between O'Connor and the Oldsmobile, and he was facing the rear of the van.  O'Connor testified that he had a clearer view of DePalma than of Flodquist, but that he did have a clear view of Flodquist.  O'Connor explained that the Oldsmobile was at a bit of an angle, so he did not have a straight-on view; the car was

turned so that he could see the entire passenger side, but not
the entire driver's side.  However, although O'Connor testified
that he had a clear view of Flodquist, he stated that he never
saw Flodquist bang on the driver's window of the Oldsmobile and
that he did not know anything about the window being broken.  He
confirmed on cross-examination that the officers were at either
side of the car with their guns out, that he could tell that they
were yelling, and that there was a long moment or moments before
the car went backwards.  O'Connor testified that when he saw
Flodquist after the incident was over, Flodquist was pale and was
bleeding from the head.

John Mills was working as a valet parker at the Brewery
Restaurant on Grand Avenue.  He was standing outside on the
sidewalk when the Oldsmobile and the two EHPD vehicles came down
the street.  Mills was called as a witness for the defense.  He
testified that he would have noticed if Flodquist had paused for
20 to 30 seconds and he did not remember Flodquist doing that.
Looking at where an exhibit showed O'Connor was positioned, Mills
stated that he was closer to the Oldsmobile than O'Connor had
been and that from his position, he could not see the front wheel
on the driver's side.  Mills also testified that both officers
exited their vehicles and approached the Oldsmobile with their
guns drawn and they yelled for the vehicle to stop.  When asked
what happened next, he stated that the car went into reverse and

he heard the engine rev and the tires spin.  He saw both officers hitting the windows with the butts of their guns and he remembered the driver's window breaking.  At that point, he noticed that one of the officers reached into the vehicle, maybe to grab a suspect and maybe to turn off the ignition.  Mills testified that his best estimate was that he heard five or six shots altogether.  He stated that the initial shot was fired once the Oldsmobile was about halfway around the circular path it traveled and there was a pause between the first shots and the rest.  Mills also testified that had Flodquist not kept moving, he would have been run over by the Oldsmobile.

Cruz testified that when Jones stopped the Oldsmobile in front of Flodquist's police van, Cruz saw Flodquist get out of the van, draw his gun and run to the driver's side of the Oldsmobile.  He testified that Flodquist looked mad and that he did not pause at any time before coming to the Oldsmobile.  Cruz testified that Flodquist broke the driver's window and started firing, and that the car was in the street on Grand Avenue when the window broke and glass came into the car.  Cruz testified that the car was not moving when Flodquist fired the first shot. He testified further that the first shot hit Jones on the left side and Jones looked over to Cruz and told Cruz to duck because the officer was shooting.  Cruz stated that he ducked and at the same time, Jones was coming on to him like he was hugging him;

then several more shots came.  Cruz testified that once the shooting started, the car started rolling by itself because it was in reverse and no one was driving it.

DePalma testified that when he first saw Flodquist after exiting his cruiser, Flodquist was at the driver's side of the Oldsmobile.  Thus, he stated he could not recall whether Flodquist paused behind the door of his police van for 20 to 30 seconds before going to the Oldsmobile.  Also, DePalma could not answer whether Flodquist was angry or not.  DePalma testified that by the time he reached the passenger side of the Oldsmobile, Flodquist had already broken the driver's window, and that DePalma then struck the passenger side window with his fist and then with his elbow in an effort to break it.  His objective was to reach over Cruz and to try to put the Oldsmobile in park.  DePalma testified that that was something he knew how to do and had done in the past.

However, after striking the window twice, DePalma quickly retreated from the Oldsmobile to his cruiser.  DePalma testified that he did this while the Oldsmobile was still on Grand Avenue.  DePalma agreed that at the time he retreated to his cruiser, he had seen no weapons in the possession of the occupants of the vehicle and that the Oldsmobile was not coming toward him; in fact, it was moving away from him.  He conceded that he turned his back away from the Oldsmobile and Flodquist in order to

retreat to his cruiser.  DePalma testified that he still could not recall to that day why he retreated back to his cruiser. After a recess, DePalma returned to the stand and testified that he had retreated quickly to his cruiser because he believed that he did not have a chance to get inside the car and if the pursuit was going to continue, the best place to be would be inside his car.  He also testified that he would not have retreated if he believed Flodquist was in imminent danger.

DePalma denied that the reason he retreated quickly to his cruiser was because Flodquist fired into the Oldsmobile immediately after breaking the window and DePalma did not want to be in the line of fire.  He testified that four shots were fired, and that the first shot was not fired until the Oldsmobile was at the 50 percent mark on the circular path it traveled before coming to a stop against DePalma's cruiser.  However, DePalma conceded that on no prior occasion, including during his interviews when the case was being investigated by the Connecticut State Police, had he ever told anyone that he heard four shots as opposed to several shots.  He also testified that he never actually saw Flodquist when Flodquist was discharging his weapon, and he conceded that he knew at the time he testified that Flodquist had had five bullets missing from his weapon once he finished shooting.

The jury could also have reasonably concluded, based solely

on the testimony of the medical examiner, Dr. Harold Wayne Carver, and the forensic scientist, Dr. Henry Lee, that Flodquist fired five shots during the incident. Dr. Carver concluded that there were a total of five bullet entrance holes in Jones' body, but that the entrance holes actually represented four shots. Dr. Lee concluded that it was more likely than not that one bullet, which was found in the console of the Oldsmobile, did not hit Jones. He conducted tests on the bullet and could find no trace of blood; he stated that in his opinion, that bullet did not hit a body.

After conducting a reconstruction of the incident based solely on the physical evidence, Dr. Lee concluded that it took from 6.5 to 8 seconds for the Oldsmobile to move from its position on Grand Avenue facing Flodquist's police van to its final position against DePalma's cruiser. He also concluded that the Oldsmobile was moving at a speed in the range of six to nine miles per hour as it followed the circular path. In Flodquist's April 22, 1997 statement, he stated, inter alia, that Jones had then turned the steering wheel quickly and the car started to accelerate quickly about the time Flodquist broke the window, and that after Flodquist shot Jones once, the car continued to accelerate and pick up speed.

Finally, defense expert Emmanuel Kapelson testified that Flodquist had a distorted perception of time if he thought he

38

stayed behind the door of his police van for 20 to 30 seconds. Kapelson attributed this distorted perception of time to a condition known as tachypsychia. He also said that, if in fact there was a pause between Flodquist's first shot and the subsequent shots, it was likely that Flodquist also had a distorted perception of that timing and the length of the pause between his first shot and the subsequent shots. However, Kapelson conceded that even if a police officer is suffering the effects of tachypsychia, shooting without knowing whether or not he is in danger would not be consistent with acceptable police practice. He also conceded on cross-examination that if an officer went up to an automobile not intending to shoot, but only shot when the window broke, striking him in the face, when he was in this condition of tachypsychia, firing under such circumstances would not be consistent with acceptable police practices because there would be no danger to the life of, or risk of serious physical injury to, the officer.

Based on the evidence submitted to it and its evaluation of the credibility of the witnesses, the jury could have reasonably concluded, inter alia, that Flodquist fired a total of five shots during the incident, and that Flodquist banged on and broke the driver's window and fired the first shot, which hit Jones, at a time when the Oldsmobile was moving in such a manner that Flodquist was not exposed to a risk of serious injury.

### 6. Actions by Other EHPD Officers Immediately Following the Shooting

Officer Robert Ranfone was driving one of the three EHPD vehicles involved in the pursuit of Jones and Cruz. However, Ranfone never had the Oldsmobile in sight and did not arrive at the scene of the shooting until after all of the shots had been fired and the Oldsmobile had come to a stop.

When Ranfone arrived on the scene, the only police vehicles there were Flodquist's police van and DePalma's cruiser. Ranfone exited his EHPD cruiser and inquired of bystanders whether anyone had seen anything. MacArthur Bethea testified that a "Spanish man" with a "dark complexion", who looked to be about forty-five to fifty years old, responded that he had seen what had happened. Ranfone told the man, "You didn't see nothing. Now get out of here." Ranfone spoke in a loud voice, ordering the man away. The man, who had been sitting in his car at the corner of Grand Avenue and Haven Street, drove away. Bethea, who had been planning to tell Ranfone what he had seen, became fearful and decided not to speak to the EHPD. Bethea subsequently spoke to members of the New Haven Police Department after his wife reported that he was a witness.

Soon thereafter, Ranfone placed Cruz, who had been removed from the vehicle, in the back of Flodquist's EHPD van. Ranfone then went to the Oldsmobile where he and DePalma removed Jones from the vehicle. Ranfone testified that he entered the

40

Oldsmobile through the passenger side door and reached across
Jones to unlock the driver side door; that DePalma entered the
vehicle through that door; that although Jones was lying slumped
over in the seat, Ranfone could not tell whether Jones was
injured and did not know whether he was dead or alive; that
Ranfone did not ask Jones if he was okay and did not say anything
else to Jones; that Ranfone then put his arms underneath Jones'
armpits (i.e. the "fireman carry") while DePalma took Jones by
the legs; and that Ranfone and DePalma then placed Jones on his
back on the ground outside the vehicle.  However, DePalma
testified that when Jones' vehicle came to a stop, DePalma's
cruiser blocked the driver side door and that door could not be
opened.  He also testified that Ranfone slid Jones across the
seat and that DePalma and Ranfone then placed Jones on the ground
outside the vehicle.  Both Ranfone and DePalma testified that
Jones was placed on the ground so that he was lying on his back
and that his hands were cuffed in front of him.  Their testimony
was contradicted by that of Gregory Liggins, an emergency medical
technician from the New Haven Fire Department, who first gave
medical treatment to Jones.  Liggins testified, and his written
report reflected, that when Liggins arrived at the scene, two or
three minutes after being dispatched, Jones was lying facedown in
the street, his feet were in the vehicle on the passenger side
and his hands were cuffed behind his back, and there was blood on

his clothing.  Liggins removed the handcuffs, using his own keys, assessed Jones' condition, and treated him.

### 7.  The Patricia Snowden Incident

Patricia Snowden testified that, on the morning of April 27, 1998, she shopped with her sister at Ames Department Store in East Haven.  Snowden was a 50-year-old African-American woman who had resided in New Haven since approximately 1960.  Prior to two related incidents involving the EHPD, Snowden had had no involvement with any police department in Connecticut other than receiving parking tickets.

After Snowden and her sister left the department store, they proceeded to her car in the parking lot.  As Snowden was driving out of the parking lot, she and her sister noticed that they were being followed by a police officer in a marked EHPD cruiser. Snowden testified that she was driving normally and had done nothing that would cause a police officer to follow her.  The officer made no effort to pull Snowden over immediately, but followed her for approximately two blocks.  When Snowden pulled into a gas station to get gas, the cruiser pulled in behind her. The officer told Snowden to get out of the car, and he asked her for her registration and license.  The stop led to Snowden being charged with misuse of a license plate, operating an unregistered motor vehicle, operating a vehicle with a suspended license, and operating a motor vehicle without the minimum insurance.  Snowden

testified that although her registration had expired, the other three charges were without foundation and were ultimately thrown out.  Based on Snowden's testimony, none of the violations with which she was charged were apparent from simply observing her vehicle.  Snowden contended that she was followed and stopped because she is African-American.

Snowden was issued a summons which required her to appear in court on October 15, 1998.  Snowden testified that she was ill on that day and did not appear.  A warrant for Snowden's arrest for failure to appear was subsequently issued on November 19, 1998.

The second incident involving the EHPD testified to by Snowden occurred on January 7, 2000.  That morning, Snowden took her two grandsons with her to visit her son, who was incarcerated in Newtown by the Connecticut Department of Correction.  While she was visiting her son, Snowden was taken into custody by a Connecticut State Trooper on an outstanding warrant on the failure to appear charge that had been issued in November 1998.  While Snowden was being transported by the trooper and explaining to him that she had heart disease and was a diabetic, Snowden passed out.  When Snowden came to, she was at Griffin Hospital in Derby.  That night, Officer McCarthy from the EHPD came to Snowden's room in Griffin Hospital and informed her that he would be taking her to jail.  Snowden testified that McCarthy informed her that he would warm up the prisoner van first because it was

cold outside, and that he also informed her that he was not going to handcuff her.  When McCarthy returned to her room, Snowden protested that she did not want to go to jail because her blood pressure was too high.  McCarthy placed Snowden in the back of the prisoner van and proceeded to transport her to East Haven Police Headquarters.  The prisoner van arrived at police headquarters around 11:42 p.m.

Snowden fell to the ground as she stepped down out of the prisoner van.  Snowden testified that she passed out after she fell, and that when she came to, she heard voices coming from different directions, telling her to get up.  She was unable to do so.  She testified that the voices came from East Haven police officers and that there were probably four or five of them. Snowden testified further that she was taken by her arms and dragged into the police station and put on a bench.

Officer McCarthy gave a very different account of what transpired prior to the time Snowden was placed on the bench. McCarthy testified that he placed a stool at the back of the van and assisted her out of the van.  He testified that Snowden then took one or two steps and then fell to the ground for no apparent reason.  A photograph showed that the stool referred to by McCarthy does not have a hard surface for stepping onto.  Rather, it was a stool with a soft surface and was used as an extra seat by officers when they were executing a search warrant and there

were not enough seats in the van.  It usually was placed directly behind the driver's seat.  McCarthy also testified that after Snowden fell, he called to the shift supervisor, Lt. DaCosta, for assistance.  (Lt. DaCosta had been a sergeant at the time of the Shane Gray incident.)  McCarthy told the jury that he and DaCosta picked up Snowden and carried her into the station and that DaCosta had Snowden's legs, while McCarthy held her under her arms.  DaCosta initially testified that he had Snowden's ankles and McCarthy had her shoulder and they "pulled" Snowden into the station.  When confronted with his use of the term "pulled," DaCosta first denied having used that term and then insisted that he and McCarthy picked up Snowden and carried her into the station to the bench.

Snowden testified that once she was on the bench, officers attempted to rouse her by pulling, poking, or hitting her, but she protested that she could not move because she was sick.  She asked them to call her daughter and told them she wanted to go home and take her medicine.

Snowden testified that the officers got very angry with her and that they kept saying that they wanted to go home but could not leave until Snowden had been booked.  Snowden testified that at this point she was repeatedly called a "nigger" and a "bitch" and told that the officers did not have time to fool with her; she said that she had not been called any names prior to that

45

point.  Snowden was told that if she did not get up, her "ass" would be dragged all the way to the cell.  Snowden testified that East Haven police officers then proceeded to do just that, dragging her all the way to a cell on her backside.

Again Officer McCarthy gave a very different account of what occurred.  He told the jury that he never mentioned to Snowden that it was near the end of his shift and he was staying late because of her.  He testified that he never called Snowden a "nigger" or a "bitch."  He also testified that when Snowden was moved from the bench to another location in the station to be processed, he placed Snowden on a chair and pushed her down the hall while she was in the chair.  He testified that Snowden was never placed in a cell.  McCarthy conceded that the officers who were present at the station when Snowden arrived were those who were finishing up their shift at midnight, and he had no explanation for how Snowden would have known what time their shift ended.  He also conceded that he stayed late that night and that he processed Snowden after the time his shift was scheduled to end, i.e. midnight.

Snowden testified that Officer McCarthy subsequently removed her from the cell and took her to a small booth to be photographed and fingerprinted; she testified that while they were in the cell, McCarthy called her a "nigger."  Snowden testified that when she fell while McCarthy was attempting to

take her picture, McCarthy told her that she was making him angry and to get her "ass" back on the stool. After taking her picture and fingerprinting her, McCarthy took Snowden back to the bench on which she had originally been placed, and Snowden stayed there until the bail bondsman arrived. The paperwork in connection with Snowden posting bond was completed around 12:48 a.m. An ambulance was summoned for Snowden at 12:48 a.m. and arrived at approximately 12:59 a.m. Snowden declined to be transported by ambulance, and she subsequently left the East Haven Police Headquarters with her daughter.

Snowden testified that after her time at the East Haven police headquarters on January 7 to 8, 2000, her blouse and her bra were ripped and that she had bruises. Snowden went to the hospital after the incident. Five or six days after the incident, after Snowden came home from the hospital, she had her daughter take photographs of the bruises. Snowden produced six photographs, which she testified show bruises on her arms, the upper part of her legs, her knee and her neck that resulted from the incident.

### C. Discussion

The plaintiff asserted a variety of Monell theories, some in combination, and the court concludes that, although the evidence in this case is not substantially similar to that in any published decision the court could locate, a reasonable jury

47

could have concluded with respect to at least one of the theories
asserted by the plaintiff, and articulated in the plaintiff's
complaint with a high degree of specificity, that all of the
elements of a <u>Monell</u> claim had been proven, based on the evidence
in the case and the instructions on the law the jury received
from the court.  Such a conclusion by the jury here is consistent
with the analysis in analogous cases involving <u>Monell</u> claims
brought based on a variety of theories.

The plaintiff alleges, as part of the <u>Monell</u> claim that, as
a result of certain policies and customs of the Town, officers of
the EHPD, including the individual defendants, "believe that
their actions would not properly be monitored and that misconduct
would not be investigated or sanctioned but would be tolerated"
and that those practices and customs of the Town deprived Jones
of his constitutional rights.  (Third Amended Complaint, Fourth
Cause of Action, at ¶ 44).  During oral argument on the Town's
initial motion for judgment as a matter of law, the plaintiff was
required to identify which <u>Monell</u> theories were still being
pursued.  The plaintiff pointed to the following four paragraphs
of the Third Amended Complaint:

> 38.  On information and belief, defendants Town and
> Police Department, as a matter of policy and practice,
> have with deliberate indifference failed to sanction or
> discipline police officers for the violation of
> constitutional rights of African Americans and other
> people of color and were aware of the violations of the
> constitutional rights of African Americans and other
> people of color by East Haven police officers, thereby

encouraging said officers, including defendants Flodquist and DePalma, to continue to engage in unlawful conduct.

39.  On information and belief, the defendants Town and Police Department have a practice, custom or usage of deliberate indifference to the constitutional rights of African Americans and other people of color in East Haven, which caused the violation of Jones' rights. This pattern of conduct, while carried out under color of law, has no justification or excuse in law, but instead is improper and illegal and is unrelated to any activity in which police officers may properly and legally engage in the course of their duties to enforce laws, protect persons and property or insure civil order.

40.  On information and belief, defendants Town and Police Department, in pursuit of the aforementioned policies, practices or usages, instructed, encouraged and/or acquiesced in the practice of harassing, stopping or otherwise interfering with the movements of African Americans and other people of color in motor vehicles who were present at or near the neighborhoods or areas of East Haven that border or abut the City of New Haven. Said policy or practice was designed to discourage African Americans and other people of color from entering or remaining in East Haven.

41.  On information and belief, the aforementioned policies and/or customs of defendants Town and Police Department were promulgated with deliberate indifference and created a hostile environment for African Americans and other people of color in violation of their constitutional rights.

(Third Amended Complaint, Fourth Cause of Action, ¶¶ 38-41).

Paragraph 36, which made reference to a policy, practice, custom and usage of the Town of hiring and retaining police officers without properly screening them as to racial animus and propensity for violence, was not claimed.  Nor was paragraph 37, which made reference to a policy, practice, custom and usage of failing to train police officers in the proper use of force,

including, without limitation, the use of deadly force and proper pursuit procedures.

The rationale for the Town's liability on the plaintiff's Monell claim was articulated by the Supreme Court as follows:

> Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels. As Mr. Justice Harlan, writing for the Court, said in Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-168, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970): "Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials . . . . Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law."

Monell, et al. v. Department of Social Services of the City of New York, et al., 436 U.S. 658, 690-91 (1978) (footnotes omitted).

Subsequent cases have interpreted Monell to mean that in order to establish a claim for municipal liability under § 1983, "'a plaintiff must plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.'" Zahra v.

Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995) (quoting

Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983)); Reed v.

Hartford Police Dept., No. 3:03CV2147(SRU)(WIG), 2006 WL 2349591,

at *4 (D. Conn. July 25, 2006) (quoting Zahra).

At issue in Monell was a municipal policy that was itself

unconstitutional.  In Spell v. McDaniel, the court concluded

that:

> Two basic theories have emerged for imposing municipal
> liability in the more typical situation where fault and
> causation cannot be laid to a municipal policy "itself
> unconstitutional." The principal theory locates fault in
> deficient programs of police training and supervision
> which are claimed to have resulted in constitutional
> violations by untrained or mis-trained police officers.
> A second theory, sometimes imprecisely subsumed within
> the first, locates fault in irresponsible failure by
> municipal policy-makers to put a stop to or correct a
> wide-spread pattern of unconstitutional conduct by police
> officers of which the specific violation is simply an
> example.

Spell v. McDaniel, 824 F.2d 1380, 1389 (4th Cir. 1987).

Here, the plaintiff's Monell claim focused on a custom or

practice of the Town, as distinct from a policy that was itself

unconstitutional.  The decisions in this area reflect that there

is no single methodology for a plaintiff to follow in

establishing that there was a pertinent custom or practice on the

part of a municipal defendant, but rather that a review of the

specific facts and circumstances of each case is required.

As recognized by the court in Spell, one line of cases

involves customs or practices of engaging in unconstitutional

conduct.  For instance, in <u>Bordanaro, et al. v. McLeod, et al.</u>,
871 F.2d 1151 (1st Cir. 1989), the plaintiffs established that
the Town of Everett, Massachusetts had an unconstitutional
practice in the form of "a longstanding, wide-spread, and
facially unconstitutional practice of breaking down doors without
a warrant when arresting a felon."  <u>Id.</u> at 1156.  The plaintiff
established the existence of this custom by testimonial evidence
from a sergeant in the Everett Police Department, from which
testimony the jury could have found that the sergeant had been
present at somewhere between 20 to 60 situations involving door
break-downs during his 24 years as a member of the department;
that a 12-pound sledgehammer was provided by the City of Everett
for use in breaking down doors; that numerous occasions on which
doors were broken down by Everett police officers involved the
practice of breaking down doors without a warrant when attempting
to arrest a felon; that the scenario followed in connection with
the arrest of the plaintiffs was not different from that followed
in any of the previous break-downs made over the years; and that
in breaking down the door in that case, the officers were
following what had been accepted departmental practice in the
past.  The court noted that "[a]dditional support for the
existence of such a practice can be inferred from the event
itself."  <u>Id.</u> at 1156.  The "incident involved the joint actions
of the entire night watch of the Everett Police Department"--a

total of five officers.  Id. at 1153.  The court also observed that "[w]hile it is true that evidence of a single event alone cannot establish a municipal custom or policy, . . . where other evidence of the policy has been presented and the 'single incident' in question involves the concerted action of a large contingent of individual municipal employees, the event itself provides some proof of the existence of the underlying policy or custom."  Id. at 1156-57 (citation omitted).  The court also noted that it was "mindful of the difficulty plaintiffs encounter in proving the existence of such police department policies and customs.  Plaintiffs are likely to encounter hostile witnesses and incomplete documentation of past abuses."  Id. at 1157, n. 5 (citations omitted).

With respect to attribution of the custom to the municipality, the court stated that "[a]lthough there was no direct evidence that the Chief of Police had actual knowledge of this policy of breaking down doors without a warrant, the evidence does support a finding of his constructive knowledge of it.  Constructive knowledge 'may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of [their] official responsibilities the [municipal policymakers] should have known of them.'"  Id. at 1157 (citations omitted).  The court concluded that the evidence was sufficient to prove the Chief of Police should have known of the

unconstitutional practice.

> The Chief's own testimony and that of others was that he
> oversaw the operations of the department and set much of
> its policy.  The evidence showed that the Chief utilized
> an extensive report review process to monitor the conduct
> of his officers and to ensure their compliance with the
> rules of the department.  Such a review process would
> alert the Chief to practices that transgressed department
> policy.  Knowledge of the practice may thus be imputed to
> the Chief.  And allowing this custom to continue amounted
> to deliberate indifference to the rights of the citizens
> of Everett, making a constitutional violation "'almost
> bound to happen, sooner or later.'" Spell, 824 F.2d at
> 1391; see also City of Canton v. Harris, –– U.S. at ––,
> 109 S.Ct. At 1205.  In this case, the jury could conclude
> that there was "supervisory encouragement, condonation
> and even acquiescence" in the unconstitutional practice.
> Voutour, 761 F.2d at 820 (noting absence of supervisory
> acquiescence in that case).  Chief Bontempo's failure to
> eradicate this facially unconstitutional practice from
> the police department attributes that custom to the
> municipality.

Id. at 1157.

In Henry v. County of Shasta, et al., 132 F.3d 512 (9th Cir.
1997), the plaintiff created a genuine issue of material fact as
to "whether the county had a policy or custom of flagrantly
violating the constitutional rights of persons stopped for minor
vehicle code infractions who refuse to sign a notice to appear or
demand to be taken before a magistrate . . . ."  Id. at 518.  In
that case, the court recognized that the existence of a policy or
custom "must be inferred circumstantially from the conduct of
individual officers and the police chief . . . ."  Id. at 519
(citation omitted).

In Spell, where the plaintiff was assaulted and physically

injured by a police officer after the plaintiff had been arrested
and was handcuffed, the court discussed the concept of
"[u]nconstitutional police practices as municipal 'custom or
usage' by condonation."  824 F.2d at 1390.  The court found that
the evidence was sufficient to support a finding by the jury,
<u>inter</u> <u>alia</u>, "that the condonation resulted from the deliberate
indifference of Chief Dixon and his authorized subordinates to
the constitutional rights of persons within the City's
jurisdiction who might have encounters with police officers
engaging in such practices."  <u>Id.</u> at 1395.  The court observed
that:

> Without having been directly authorized, or tacitly
> encouraged, or inadequately trained in specific ways by
> responsible municipal policymakers, police officers, like
> other public employees, may fall into patterns of
> unconstitutional conduct in their encounters with
> suspects, arrestees, persons in custody and others
> involved in law enforcement situations.

<u>Id.</u> at 1390.  As to what was required to attribute the custom or
usage to the municipality, the court stated:

> Municipal fault for allowing such a developed "custom or
> usage" to continue requires (1) actual or constructive
> knowledge of its existence by responsible policymakers,
> and (2) their failure, as a matter of specific intent or
> deliberate indifference, thereafter to correct or stop
> the practices.  Constructive knowledge may be inferred
> from the widespread extent of the practices, general
> knowledge of their existence, manifest opportunities and
> official duty of responsible policymakers to be informed,
> or combinations of these.  The inculpating knowledge,
> whether actual or constructive, may be either that of the
> municipal governing body itself, or of municipal
> officials having final policymaking authority in
> municipal law enforcement matters.

Id. at 1391.  The plaintiff in Spell had proceeded under alternative theories of a deficient training policy and a condoned custom and usage, and the court concluded that there had been sufficient evidence to support a jury verdict in the plaintiff's favor under each of those theories.

In Dunn v. City of Newton, Kansas, et al., No. 02-1346-WEB, 2003 WL 22462519 (D. Kan. Oct. 23, 2003), the plaintiff contended that the police department had a custom or policy of allowing its officers to use excessive force.  Although the plaintiff pointed to five specific incidents in support of his claim, the court granted summary judgment in favor of the municipality.  The events on which the plaintiff's claim was based occurred in February 2001.  The first incident relied on by the plaintiff had occurred in February 1992, and the court noted that the plaintiff's only evidence was testimony of a witness who had arrived at the scene after officers had already taken the individuals in question into custody and who apparently had no personal knowledge of what had prompted the officers to detain the individuals.  The second incident occurred in August 1999 and involved an arrestee complaining that the arresting officer used excessive force.  The arrestee's complaint to the chief of police had been referred to an outside agency, which found no wrongdoing on the part of the officer.  Also, the court noted that at some point in 1999, the city established a law enforcement advisory

board to serve as a sounding board for citizen concerns over law enforcement issues.  The third incident occurred in January 2001, i.e. the preceding month.  An arrestee had complained to other officers that a particular officer threatened him, whereupon that particular officer had "tried to rephrase his story"; the court noted that the plaintiff did not file his lawsuit until October 31, 2001.  Id. at *4.  The fourth incident occurred in March 2001 and the fifth incident occurred in November 2001.  Both the fourth and fifth incidents involved the same officer, and this officer had been involved in the second and third incidents as well.  Following the fourth incident, the officer was reprimanded, and after the fifth incident, the officer was terminated and criminal charges were brought against him.  The court found these incidents insufficient to "support the contention that the violation was part of a municipal custom of using excessive force."  Id. at *8.  See also Lewis v. Meloni, et al., 949 F.Supp. 158, 164 (W.D.N.Y. 1996) (plaintiff alleged but failed to create a genuine issue of material fact as to the existence of a municipal policy or custom of deliberate indifference to the possibility of a municipal policy or custom of unconstitutional arrests).

Plaintiffs have also brought Monell claims based on a municipal defendant's alleged custom or practice of deficient hiring or recruiting of police officers, training of police

officers, supervision of police officers, and/or investigation of complaints against or disciplining of police officers, where the custom or policy evidenced deliberate indifference to the constitutional rights of those with whom the police would come into contact.

Customs or practices relating to hiring and/or recruitment were addressed in <u>Board of the County Commissioners of Bryan County, Oklahoma v. Brown, et al.</u>, 520 U.S. 397, 404 (1997). There, the Court addressed the issue of whether "a single hiring decision by a county sheriff can be a 'policy' that triggers municipal liability."  The plaintiff brought an action alleging use of excessive force by a member of the sheriff's department. The Court emphasized that there must be a link between the actual background of the person being hired and "the risk that, if hired, he would use excessive force."  <u>Id.</u> at 411.  The Court stated:

> [A] finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury.  Rather, it must depend on a finding that <u>this</u> officer was highly likely to inflict the <u>particular</u> injury suffered by the plaintiff.  The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong.

<u>Id.</u> at 412.  Also, the Court observed that "[c]laims not involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights, present much more difficult problems of proof."  <u>Id.</u> at

406.

The circumstances under which inadequacy of police training
may serve as a basis for section 1983 municipal liability were
discussed in City of Canton, Ohio v. Harris, et al., 489 U.S. 378
(1989). There, the Court held that "[o]nly where a
municipality's failure to train its employees in a relevant
respect evidences a 'deliberate indifference' to the rights of
its inhabitants can such a shortcoming be properly thought of as
a city 'policy or custom' that is actionable under § 1983." Id.
at 389. The Court explained:

> The issue in a case like this one, however, is whether
> that training program is adequate; and if it is not, the
> question becomes whether such inadequate training can
> justifiably be said to represent "city policy." It may
> seem contrary to common sense to assert that a
> municipality will actually have a policy of not taking
> reasonable steps to train its employees. But it may
> happen that in light of the duties assigned to specific
> officers or employees the need for more or different
> training is so obvious, and the inadequacy so likely to
> result in the violation of constitutional rights, that
> the policymakers of the city can reasonably be said to
> have been deliberately indifferent to the need. In that
> event, the failure to provide proper training may fairly
> be said to represent a policy for which the city is
> responsible, and for which the city may be held liable if
> it actually causes injury.

Id. at 390 (footnotes omitted). See also Lewis v. Meloni, et
al., 949 F.Supp. at 163 ("The existence of a policy or custom
which violates constitutional rights may be demonstrated by
'evidence that the municipality so failed to train its employees
as to display a deliberate indifference to the constitutional

rights of those within its jurisdiction.'") (citations omitted);

Dempsey v. Town of Brighton, et al., 749 F.Supp. 1215, 1228, 1229

(W.D.N.Y. 1990) (rejecting plaintiffs' argument "that

insufficient training and supervision has caused the Town of

Brighton's police department to harass black persons because of

their race, in violation of their civil rights" because the

plaintiffs failed to produce any evidence as to deficient

training except the incident during which they contended their

rights were violated).

The plaintiff established the existence of a policy of non-supervision on the part of the defendant municipality in Fiacco

v. City of Rensselaer, New York, et al., 783 F.2d 319 (2d Cir.

1986). There, the plaintiff introduced "evidence of the failure

of the City defendants to adopt appropriate procedures to deal

responsibly with complaints of police brutality, and evidence of

their failure to make reasonable investigations of such

complaints." Id. at 328. "[A]s to specific allegations of

police brutality during the five years before the incident

involving Fiacco, Fiacco introduced seven written claims that had

been filed, called as witnesses four of the complainants, and

elicited testimony from [chief of police] Stark as to his

handling of complaints." Id. at 329. The five most recent

claims had all been made after Stark became the police chief.

The court concluded that:

> Drawing all reasonable inferences in favor of Fiacco, the jury could rationally have concluded that during the two years prior to Fiacco's arrest, the City defendants' response to complaints of use of excessive force by City police officers was uninterested and superficial. It could reasonably have inferred that a response to complaints that generally consisted solely of the chief's speaking to the accused officer––with no formal statement being taken from the complainant, no file being created, no notation being made in the officer's file, and no further investigation being made––would have been viewed by the officers, and should be viewed by an objective observer, as reflecting an indifference by the City to the use of excessive force. The permissibility of this inference is not diminished by the fact that none of the claims introduced by Fiacco had yet been adjudicated in favor of the claimants. The jury was free to reason that the very failure of the City defendants to conduct a nonsuperficial investigation into civilian claims of excessive force indicated that the City and the chief simply did not care what a thorough investigation would reveal, that they were indeed indifferent to whether or not excessive force was used.

Id. at 331. In Sango v. City of New York, et al., No. 83 CV 5177, 1989 WL 86995, at *14 (E.D.N.Y. July 25, 1989), the court commented on Fiacco, stating that "[c]ontrary to the City's suggestion . . . the Second Circuit's opinion in Fiacco cannot be read to suggest that any showing short of the overwhelming evidence adduced there is insufficient as a matter of law to make out a case against the City."

> To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious. See Canton v. Harris, 489 U.S. at 390, 109 S.Ct. at 1205. An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.

<u>Vann v. City of New York</u>, 72 F.3d 1040, 1049 (2d Cir. 1995). In addition, the court noted that "[d]eliberate indifference may also be shown through expert testimony that a practice condoned by the defendant municipality was 'contrary to the practice of most police departments' and was 'particularly dangerous' because it presented an unusually high risk that constitutional rights would be violated." <u>Id.</u> at 1049. In <u>Davis v. Lynbrook Police Dept.</u>, 224 F.Supp.2d 463 (E.D.N.Y. 2002), the court denied the city's motion for summary judgment where the plaintiff presented evidence of nine "criticisms and complaints different people had made regarding [an officer's] conduct as a police officer." <u>Id.</u> at 470. While the court found that three of these criticisms or complaints were irrelevant, "a reasonable jury could infer from [the remaining six] complaints an obvious need for more or better supervision to protect against constitutional violations." <u>Id.</u> at 479. Furthermore, the court found that a reasonable jury could find that there was no "meaningful investigation into any of the claims". <u>Id.</u> at 479.

As to customs or policies with respect to investigation of complaints against police officers or disciplining police officers, in <u>Saviour v. City of Kansas City, Kansas, et al.</u>, Civ. A. No. 90-2430-L, 1992 WL 135019 (D. Kan. May 15, 1992), the court denied the city's motion for summary judgment on the plaintiff's claim that his injuries were "the direct result of a

policy or custom by the City which amounted to deliberate indifference in the supervision and discipline of officers." Id. at *3. The plaintiff presented extensive statistical evidence with respect to complaints of excessive force against city police officers. The court observed:

> Although the plaintiff's statistical evidence is
> relevant, this court would not find the statistical
> evidence alone enough to prove the existence of a policy
> or custom. See McCleskey v. Kemp, 481 U.S. 279 (1987).
> In the present case, the plaintiff has challenged the
> City's investigation of excessive force complaints as
> cursory and indifferent. The plaintiff proffers
> witnesses who themselves have filed excessive force
> complaints that they believe to have been wrongfully
> determined by the City to be unfounded. The question of
> whether the City does thoroughly investigate complaints
> is a question of fact for the jury. Drawing all
> reasonable inferences in favor of the plaintiff, if the
> testimony of those witnesses is believed it is possible
> that a jury could rationally conclude that the City's
> response to complaints of use of excessive force by City
> police officers was uninterested and superficial. The
> permissibility of this inference is not diminished by the
> fact that many of the complaints have been determined by
> the City to be unfounded.

Id. at *4. The plaintiff in Saviour "also offered evidence that the police department engages in a practice of destroying internal affairs records." Id. at *5. The court noted that the strength of this argument was "marginal", but that it did provide "at least some evidence in support in support of plaintiff's allegation." Id. at *5. On the other hand, in Dunn, where the plaintiff also contended that five incidents evidenced a "deliberate indifference to or tacit approval of excessive force by the City's policymaking officials after notice of such

misconduct," the court observed:  "Taken together the incidents point to a possible pattern of questionable behavior by Officer McMichael.  But the City did not ignore the problem; it reprimanded the officer and subsequently terminated him."  2003 WL 22462519, at *8.

Three situations, pertinent to the analysis in this case have been the subject of discussion in decisions on <u>Monell</u> claims: (1) situations involving a single incident of its type, out of which the plaintiff's claim arises; (2) situations where the plaintiff relied on incidents occurring subsequent to the incident out of which the plaintiff's claim arises; and (3) situations where the plaintiff claimed there was a custom or policy based on racial discrimination.

In situations where the only incident relied upon by the plaintiff is that out of which the plaintiff's claim arises, it is generally the case that such an incident is not sufficient to impose liability under <u>Monell</u>.  In <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 822 (1985), the Supreme Court stated:

> Proof of a single incident of unconstitutional activity is not sufficient to impose liability under <u>Monell</u>, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.  Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved.  But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the

64

"policy" and the constitutional deprivation.

Id. at 823-24 (footnotes omitted).  See also Villante v. Dept. of
Corrections of City of New York, et al., 786 F.2d 516, 519 (2d
Cir. 1986) ("an isolated act of excessive force by a single, non-
policymaking municipal employee, standing alone, is insufficient
evidence . . ."); Turpin v. Mailet, et al., 619 F.2d 196, 202 (2d
Cir. 1980) (plaintiff failed to prove any official policy because
"the evidence of official policy supposedly authorizing [the
officer's arrest of the plaintiff] consisted solely of the
Board's failure to discipline [another officer who had allegedly
used excessive force on the plaintiff in the past] for a single
incident of illegality"); Sarus v. Rotundo, 831 F.2d 397, 402 (2d
Cir. 1987) ("the only relevant evidence presented by appellees
was the manner in which they themselves were arrested.").

An example of where proof of the incident includes proof
that it was caused by an existing unconstitutional municipal
policy is found in Grandstaff v. City of Borger, Texas, et al.,
767 F.2d 161 (5th Cir. 1985).  There, the court concluded that
the plaintiff could not recover pursuant to a theory of a custom
or practice of inadequate training, but could recover pursuant to
a custom or practice of operating a police force where prevalent
recklessness endangered human life and safety--what the court
referred to as a "policy/custom of dangerous recklessness."  Id.
at 170.  The court stated:

There was no direct testimony of prior misconduct within the Borger police force or of prior knowledge and state of mind of the police chief.  We know from <u>Tuttle v. Oklahoma City</u>, -- U.S. --, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), that isolated instances of police misbehavior are inadequate to prove the knowledge and acquiescence by a city policymaker in that manner of conduct.  That is not our case, however.

* * *

The evidence does prove repeated acts of abuse on this night, by several officers in several episodes, tending to prove a disposition to disregard human life and safety so prevalent as to be police policy or custom.  The entire six officers of the night shift of the City of Borger participated in this wild barrage, when the exercise of the least care and the use of any rational and organized plan would have avoided the death of James Grandstaff.

<u>Id.</u> at 171.  In <u>Cawthon v. City of Greenville</u>, 745 F.Supp. 377, 384 (N.D. Miss. 1990) (quoting <u>Coon v. Ledbetter</u>, 780 F.2d 1158, 1161 (5th Cir. 1986)), the court observed that "the Fifth Circuit has expressly limited <u>Grandstaff</u> to 'equally extreme factual situations.'"  The court summarized the material facts in <u>Grandstaff</u> as follows:

In <u>Grandstaff</u>, the entire night shift of the Borger police department opened fire upon and killed an innocent person after mistaking him for a fugitive. . . . In affirming liability against the city, the Fifth Circuit held that the officers' concerted action indicated a prior existing policy authorizing the reckless use of deadly force, and that a prior unconstitutional policy could also be inferred from the city's subsequent failure to reprimand, discharge or admit error on the part of any of its officers. . . .  This additional evidence, concluded the court, allowed a factfinder to reasonably infer a municipal policy based on a single incident of conduct. . . .

<u>Cawthon</u>, 745 F.Supp. at 383 (citations omitted).

66

Evidence of incidents that occurred subsequent to the incident out of which the plaintiff's claim arises may or may not be probative, depending on the circumstances.  It appears that such evidence is probative for purposes of showing the existence of a municipal policy or custom.  In Henry, 132 F.3d at 519 (9th Cir. 1997), the court stated "we reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry."  Although in a different context, the Second Circuit cited Shasta with approval in N.L.R.B. v. Local 46, Metallic Lathers Union, 149 F.3d 93, 104 n. 5 (2d Cir. 1998).  See also Bordanaro, 871 F.2d at 1166-67 ("The [Supreme Court] has never held that inferences about what customs or policies existed in a city before an event could not be drawn from subsequent actions.  Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right."); Foley v. City of Lowell, Massachusetts, 948 F.2d 10, 14 (1st Cir. 1991) (to decide if "post-event evidence" is admissible, the court must ask "whether the evidence sufficiently relates to the central occurrence" and noting that there "the lack of restraint the police officers exhibited on both occasions itself suggested the existence of an official policy of tolerating imbrutage.").  But see Bemis v. Edwards, et al., 45 F.3d 1369 (9th Cir. 1995)

("Whereas evidence of <u>prior</u> incidents of police misconduct may indicate that [a policy of deliberate indifference] exists, it is doubtful that the 911 operator's failure to send an ambulance to help [the plaintiff's companion] <u>after</u> his beating, even if attributable to the city, would be relevant to the claim."); <u>Harvey v. Hankins, et al.</u>, 681 F.Supp. 622, 624 (W.D. Mo. 1988) ("Logically, [evidence of subsequent allegations of excessive force] would have been irrelevant to show a deliberate indifference to the plaintiff's rights and to show the existence of a policy or custom of police misconduct.").

On the other hand, evidence of subsequent incidents is not probative for purposes of establishing causation of the incident out of which  the plaintiff's claim arises.  <u>See, e.g.</u>, <u>Sango</u>, 1989 WL 86995, at *20 n. 2 ("conduct occurring after the incident at issue lacks the requisite 'affirmative link' to plaintiffs' injuries-that is, plaintiffs cannot establish causation. . . . Evidence of a municipal policymaker['s] response to misconduct can be helpful in determining the municipal policy existing before the incident."); <u>Woo v. City of New York, et al.</u>, No. 93IV7007(AJP)(HBD), 1996 WL 457337, at *6 (S.D.N.Y. Sept. 6, 1996) (quoting <u>Sango</u>); <u>see also</u> <u>Dejesus, et al. v. Village of Pelham Manor, et al.</u>, 282 F.Supp.2d 162, 176 (S.D.N.Y. 2003) (observing that "district courts in this Circuit directly addressing the specific issue of establishing deliberate

indifference for the purpose of proving municipal liability have held that subsequent acts, standing alone or even in conjunction with other prior acts, are not probative of a prior municipal policy because they can not provide the necessary causal link between a custom or policy and the conduct at issue", but "not reaching the issue of whether subsequent conduct might not, in some circumstances, be indicative of a prior policy of failing to supervise").

In addition, evidence of subsequent incidents is not probative, in the context of a claim based on deliberate indifference, for purposes of establishing knowledge of the risk of harm to those a police officer would come into contact with. See, e.g., Lewis, 949 F.Supp. at 164 n. 5 ("[S]ince the offensive police conduct alleged in these complaints occurred over two years after the conduct alleged in Lewis' complaint, Lewis can hardly contend these actions support a claim that Sheriff Meloni had prior knowledge of VanThof's alleged propensity to engage in illegal arrests."); Rivera v. City of Rochester, et al., 21 F.Supp.2d 230, 234 (W.D.N.Y. 1998) ("1995 complaints are not probative of whether or not the Rochester Police Department had any knowledge in 1992 of MacFall's alleged propensity to commit constitutional violations.").

The instant case is not the first case where the plaintiff has claimed that a municipal defendant had a custom or policy

arising out of racial discrimination. However, a review of the reported decisions suggests that plaintiffs typically find it difficult to get past the summary judgment stage with such claims. In Estate of Sinthasomphone v. The City of Milwaukee, et al., 785 F.Supp. 1343, 1350 (E.D. Wis. 1992), the complaint alleged "that dating back to 1958, the Milwaukee Police Department has been involved in discrimination against racial minorities." In ruling on a motion to dismiss, the court observed:

> [The complaint] asserts that over the years a mind-set has been established in the department: certain discriminatory behavior has been tolerated, giving officers the impression that they can get by with behavior which leads to incidents such as that of May 27. . . . I find that the complaint states a claim that a de facto custom or policy exists, giving rise to section 1983 liability. Proving the claim may be a difficult task, but the difficulty of proof is not relevant at this stage of the proceedings. A jury will have to eventually resolve this issue.

Id. at 1350-51.

In Hannah v. City of Dover, et al., No. Civ. 01-312-SLR, 2005 WL 735882, at *3 (D. Del. Mar. 20, 2005), the plaintiff alleged that the City of Dover had "a custom of racial discrimination or permitting its police officers to use excessive force when arresting someone." However, the court granted summary judgment in favor of the city, noting that the only evidence of a custom of racial discrimination identified by the plaintiff was that the State of Delaware had participated in the

slave trade.  In <u>La v. Hayducka, et al.</u>, 269 F.Supp.2d 566, 586

(D. N.J. 2003), the plaintiff alleged that the police department

"'adopted an unconstitutional policy, custom, practice, and usage

of racial animosity and intentional discrimination toward

plaintiffs because they are Korean-American.'" The court granted

summary judgment in favor of the municipal defendant, observing

that the fact that the police department did not have an Asian

officer on its force at the time of the shooting did not provide

the substance necessary to support the plaintiff's allegations.

In <u>Frazier v. City of Philadelphia, et al.</u>, 927 F.Supp. 881, 885-

86 n. 8 (E.D. Pa. 1996), the plaintiff alleged that the

"'Philadelphia Police [D]epartment has adopted and maintained for

many years a recognized and accepted policy, custom, and practice

toward persons of the African American race of systematically

shooting them, although they are only suspected of committing

crimes and subjecting them to the same type of treatment to which

the decedent was subjected, which policy constitutes the use of

excessive force.'" While the plaintiff produced statistical

evidence, the court found such evidence insufficient and

consequently, granted summary judgment in favor of the municipal

defendant.  The court observed:

> To support his claim that the city maintained a policy or
> custom to shoot African Americans, plaintiff cites
> statistical data about how frequently the police internal
> affairs department has investigated Philadelphia police
> officers for discharging weapons, how frequently these
> discharges violated police department policy, and when

the discharge violated department policy, how frequently
that violation related to the department's policy on the
appropriate use of deadly force. The statistical data
does not, however, specify the racial composition of the
citizens involved in these discharge incidents. Thus,
the statistics are irrelevant to the question of whether
the city maintained a policy of shooting African
Americans. Moreover, the plaintiff has produced no other
evidence indicating that police are more likely to use
deadly force on African Americans than on Caucasians.

Id. at 886.

In Thompson v. City of Meriden, et al., No. 3:94-CV-1950,
1999 WL 301693, at * 1 (D. Conn. Apr. 14, 1999), the plaintiff
brought a claim against the municipal defendant "based on its
deliberate indifference to the mistreatment of African-Americans
and its failure to implement policies, procedures, training, and
discipline of its police officers concerning racial
discrimination and the proper use of force." The court granted
summary judgment in favor of the defendant, concluding that the
plaintiff had presented no evidence that the City "maintained or
condoned a policy or custom of allowing its police department to
subject arrestees to excessive force and racial discrimination."
Id. at *10. In Rodriguez v. City of New York, et al., No. 85 CV
1873, 1988 WL 68853, at *3 (E.D.N.Y. May 13, 1988), the
plaintiffs alleged, inter alia, that the City had a policy or
custom of racial discrimination and/or excessive force, which
caused the plaintiff's injuries. The court granted summary
judgment in favor of the municipality because the plaintiffs
stated in their depositions that they had no reason to believe

72

that the beating of one of the plaintiffs was racially motivated and "[t]he only material submitted by the plaintiffs relating to racial motivation is the general material, unrelated to the events of this case," from a congressional hearing and a state senate investigation. Id. at *3. See also House, et al. v. New Castle County, et al., 824 F.Supp. 477, 480 n. 6, 484 (D. Del. 1993) (summary judgment granted where plaintiff alleged that defendant "inflicted harm upon black suspects for no just reason other than the fact that they are black", but "admit[ted] having no factual basis" for that claim); Brown, et al. v. City of Camden, et al., Civil No. 03-1303 JBS, 2006 WL 2177320, at *2, at *8 (D. N.J. July 27, 2006) (summary judgment granted where plaintiff alleged defendant had "an unconstitutional policy of racial profiling and excessive force", but failed to present "any evidence of an official policy or practice of racial profiling or excessive force by the City of Camden or its officers."); Dempsey v. Town of Brighton, 749 F.Supp. 1215, 1229 n. 5 (W.D.N.Y. 1990) (summary judgment granted where plaintiff failed to specifically identify or offer "proof of a custom or policy which authorizes police officers to harass blacks or to use excessive force in confrontations with citizens, particularly blacks.").

Viewing the evidence in this case in light of the body of law discussed above, the court concludes that the evidence supports a finding by a reasonable jury that all the elements of

a _Monell_ claim were satisfied with respect to at least one of the theories claimed by the plaintiff.  As noted above, the plaintiff did not claim, during oral argument on the Town's initial motion for judgment as a matter of law, a _Monell_ claim based on hiring and retention of police officers without properly screening them as to racial animus and propensity for violence, nor a _Monell_ claim based on failure to train police officers on the proper use of force.

However, the plaintiff did claim, based on paragraph 38 of the Third Amended Complaint, a _Monell_ claim asserting that the Town, with deliberate indifference, failed to sanction or discipline EHPD officers for violating the constitutional rights of African-Americans and other people of color, even though the Town was aware of those violations, and that such failure encouraged EHPD officers, including Flodquist and DePalma, to continue to engage in unlawful conduct; the plaintiff further claimed, as alleged in paragraph 41, that the Town's policy or custom was promulgated with deliberate indifference and created a hostile environment for African-Americans and other people of color in violation of their constitutional rights.

It is not readily apparent that the plaintiff produced evidence sufficient for a reasonable jury to conclude that the plaintiff established all of the elements of a _Monell_ claim based on this theory.  In establishing that the Town was aware of

violations of the constitutional rights of African-Americans and other people of color by officers of the EHPD at the time of the Jones shooting, the plaintiff had to establish, in this case, awareness on the part of the chief of police. In doing so, the plaintiff necessarily relied on incidents that predated the shooting. See Lewis, 949 F.Supp. at 164; Rivera, 21 F.Supp. 2d at 234. In addition, the plaintiff had to establish deliberate indifference on the part of the chief of police. See Spell, 824 F.2d at 1391; Bordanaro, 871 F.2d at 1157. The incidents the jury reasonably could have concluded predated the Jones shooting were the Shane Gray incident, the comment to Jackman, and the T-shirt incident. However, neither the comment to Jackman nor the T-shirt incident constituted a violation of constitutional rights of African-Americans or other people of color. As to the Shane Gray incident, the jury was presented with evidence that an investigation was conducted, that the conclusion of the investigation was that Flodquist's actions were justified, and that the results were forwarded to the then chief of police, i.e. Chief Pascarella. However, there was no evidence that Chief Pascarella had any knowledge of what transpired during the Shane Gray incident other than what he learned from a report informing him that Flodquist's actions had been justified.

The plaintiff also claimed, based on paragraph 40 of the Third Amended Complaint, a Monell claim asserting that in order

to discourage African-Americans and other people of color from entering or remaining in the Town, the Town instructed, encouraged, or acquiesced in the practice of harassing, stopping, or otherwise interfering with the movements of African-Americans and other people of color in motor vehicles who were in or near areas of the Town that border or abut the City of New Haven; the plaintiff further claimed, as alleged in paragraph 41, that the Town's policy or custom was promulgated with deliberate indifference and created a hostile environment for African-Americans and other people of color in violation of their constitutional rights.  During the trial, counsel for the plaintiff referred to this as operation by the Town of a "border patrol."

It is not readily apparent that the plaintiff produced evidence sufficient for a reasonable jury to conclude that the plaintiff established all of the elements of a <u>Monell</u> claim based on this theory.  In establishing that a custom or policy of operating what was termed a "border patrol" could be attributed to the Town, the plaintiff could rely on incidents that occurred both prior and subsequent to the Jones shooting.  <u>See</u> <u>Henry</u>, 132 F.3d at 519; <u>Bordanaro</u>, 871 F.2d at 1166-67.  However, in establishing the third element of a <u>Monell</u> claim, causation of the incident out of which the plaintiff's claim arises, the plaintiff can rely only on incidents that occurred prior to the

Jones shooting.  See Sango, 1989 WL 86995, at *20 n. 2; Woo, 1996 WL 457337, at *6.  Thus, the April 27, 1998 incident involving Patricia Snowden is not pertinent to the issue of causation.  The only other evidence concerning stopping African-American motorists related to the Shane Gray incident and the Jones shooting.  It is undisputed that Shane Gray was pursued by Flodquist across the field only after he jumped out of a still-moving car, leaving it to continue on and crash into a wooden guard-rail, and also undisputed that Jones refused to stop when being directed to pull over by a clearly identifiable police vehicle.

The plaintiff also claimed, based on paragraph 39 of the Third Amended Complaint, that the Town had a custom or practice "of deliberate indifference to the constitutional rights of African-Americans and other people of color in East Haven, which caused the violation of Jones' rights."  (Third Amended Complaint, Fourth Cause of Action, at ¶ 39).  The plaintiff further claimed, as alleged in paragraph 41, that the Town's policy or custom was promulgated with deliberate indifference and created a hostile environment for African-Americans and other people of color in violation of their constitutional rights.  In addition, in paragraph 44, the plaintiff alleged that officers of the EHPD believed that their actions would not be properly monitored and that misconduct would not be investigated or

sanctioned, but would be tolerated, and that these practices and customs of the Town deprived Jones of his constitutional rights. Based on the evidence submitted to it and its evaluation of the credibility of the witnesses, the jury could have reasonably concluded that the Town had an official custom or practice of deliberate indifference to the constitutional rights of African-Americans and other people of color, and that the Town's custom or practice caused Jones to be subjected to denial of a constitutional right.

As recognized by the court in <u>Estate of Sinthasomphone</u>, proving that discriminatory behavior has been tolerated, thereby giving officers the impression they can get by with improper conduct, is a difficult task. <u>See</u> 785 F.Supp. at 1351. Here, unlike the trial in <u>Bordanaro</u>, no member of the police department testified as to the inner workings of the department. However, there was sufficient circumstantial evidence upon which the jury could have reasonably found that the town had a custom of deliberate indifference to the constitutional rights of African-Americans and other people of color. The jury actually heard testimony from and had the opportunity to observe a significant portion of the EHPD, and it heard about the involvement in various incidents of additional members of the EHPD.

The comments to Donald Jackman on January 8, 1996 were made in the heat of the moment. The jury reasonably could have placed

great weight on the statement from one of the four officers to Jackman to the effect that the fact that Jackman was white made a big difference in how the members of the EHPD had treated him, i.e., in substance, that Jackman's rights would not have been respected to the same degree if he were African-American. The jury could reasonably have placed a great deal of weight on this statement for the same reason that excited utterances are an exception to the hearsay rule, i.e. "circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." Fed. R. Evid. 803 advisory committee's note. The jury could also have reasonably concluded that this member of the EHPD also used a racial epithet as part of the Whalley Avenue comment, and that the comment reflected racial prejudice towards African-Americans. The four officers at Jackman's residence that evening constituted about one-half of the officers who were on patrol for the EHPD during that shift, and one of them was a supervisor.

Accepting Shane Gray's version of the September 1991 incident involving Officer Flodquist, the jury reasonably could have concluded that Flodquist not only struck Gray with his cruiser while pursuing him across the field, but also that, once Flodquist's cruiser had gone into the ditch, Flodquist fired his weapon twice at Gray without justification, and fortunately

missed him.  The jury could have reasonably concluded that Flodquist falsified his case/incident report in order to create a justification for shooting at Gray, and that Gray was improperly charged with the offense of carrying a pistol without a permit in order to cover up Flodquist's improper discharge of his weapon. It could have also reasonably concluded that Flodquist and the other members of the EHPD who were on duty that evening ignored Gray's complaints about being struck by the cruiser and being shot at without justification, that the procedure pursuant to which Gray should have been turned over to the New Haven police was not followed, and that a procedure for recording on a prisoner's cell card complaints made by that prisoner was not followed in Gray's case.  Additionally, the jury could have reasonably concluded, based on the fact that two of the five or six EHPD units on patrol that evening were sitting on Eastern Street at Eastern Circle, and based on Flodquist's testimony that Eastern Street was in his normal course of patrol, that the EHPD did have a practice of patrolling that area of New Haven that abutted East Haven and was heavily populated by people of color.

The jury was also entitled to rely on its conclusion that Flodquist used excessive force in shooting Jones in reaching a conclusion that a custom of indifference to the constitutional rights of African-Americans existed.  See Bordanaro, 871 F.3d at 1156.  In addition, in inferring the existence of such a custom,

the jury could have placed weight on the evidence as to Officer Ranfone sending away the dark complexioned Hispanic male who was a witness to the Jones shooting. Based on the testimony of Ranfone and DePalma as to how Jones was handled after the shooting, as opposed to the testimony of other witnesses as to how Jones was handled, the jury could have also reasonably concluded that Ranfone and DePalma handled the fatally injured Jones in a manner that they knew was not appropriate, treating him with a cavalier disregard for his serious injuries.

The jury could have reasonably concluded that the racially offensive T-shirt incident was a reflection of the culture of the EHPD at the time of the Jones shooting. Detective Raccuia, the president of the union, testified that there was no controversy when the racially offensive T-shirts were first worn. Both Detective Raccuia and Chief Criscuolo testified that they had no idea how many members of the EHPD had been wearing the T-shirts, and when Chief Criscuolo was confronted with the question as to whether 10 or even 20 members of the EHPD wore the T-shirts, the jury could have reasonably concluded from his response that he had no basis for denying that 20 members of the department wearing racially offensive T-shirts was something that could happen at the EHPD.

The Patricia Snowden incident also provided evidence that supported a finding of the existence of such a custom. Accepting

Snowden's version of events, the jury could have reasonably concluded that the fact that the Snowden incident could happen subsequent to both a public meeting concerning the T-shirt incident and an incident as dramatic as the Jones shooting reflected the presence of a deeply embedded custom.

Finally, Patricia Snowden's testimony about the traffic stop in April 1998 reflected that the only way she thought she had been mistreated was by being followed and stopped because she is African-American, and her testimony about the January 2000 incident reflected that she was treated well until EHPD officers became upset with her.  Officer Flodquist only shot at Shane Gray after the occurrence of something the jury could have reasonably concluded was upsetting to him, i.e., having his cruiser go into a ditch.  Also, the jury could have reasonably concluded that the officers on the scene at the Jackman incident were upset. Likewise, the jury could have reasonably concluded that at the time Officer Ranfone arrived at the scene of the Jones shooting, he understood from the radio transmissions that Officer Flodquist had been hit by the Oldsmobile and was upset about that fact at the time he ran off the witness with the dark complexion.  Thus, the jury could have reasonably viewed the custom as one that was more likely to make itself evident when an officer found himself in an upsetting situation.

The jury could have reasonably concluded that Chief

Criscuolo had actual or constructive knowledge of a custom or practice within the EHPD of deliberate indifference to the constitutional rights of African-Americans and other people of color. Criscuolo testified that he joined the EHPD as a patrolman in 1963, was promoted to the rank of Sergeant in 1970, and to the rank of Lieutenant in 1975. He held the rank of Captain and was commander of the patrol division from 1985 to 1992. Thus, Criscuolo served at every level in a relatively small police department over the course of his 35-year career with the EHPD. However, the jury could have reasonably concluded that the most compelling evidence of awareness on the part of Chief Criscuolo was the fact that he investigated the Shane Gray incident.

As to establishing deliberate indifference on the part of Chief Criscuolo, the jury could have reasonably concluded, based on how he responded (or failed to respond) to the T-shirt incident and his testimony pertaining to that incident, that he was deliberately indifferent to a custom or practice within the EHPD of deliberate indifference to the rights of African-Americans and other persons of color. The jury also could have reasonably relied upon his testimony pertaining to the absence of EHPD policies prohibiting discriminating against people based on race.

Based on the foregoing, the jury could have reasonably

concluded not only that there existed within the EHPD a custom or practice of deliberate indifference to the constitutional rights of African-Americans, but also reasonably concluded that the Chief of Police was aware of the custom or practice and deliberately indifferent to it. Thus, the jury could have concluded that this custom or practice was an official custom or practice of the Town, which satisfies the first element of a Monell claim.

To satisfy the second and third elements of a Monell claim, a plaintiff must establish that the official custom or practice caused the plaintiff to be subjected to denial of a constitutional right. The jury was specifically asked to determine whether Officer Flodquist violated Jones' constitutional rights by using excessive force against him, and it concluded that he did. Based on the evidence summarized above with respect to the Jones shooting, the jury could have reasonably reached that conclusion, satisfying the third element of a Monell claim.

The second element requires a plaintiff to establish a causal connection between the official custom and the denial of the constitutional right. The jury could have reasonably concluded that the requisite causal connection was established here. It is undisputed that Flodquist understood that the occupants of the Oldsmobile he was pursuing were African-

American.  The jury could have reasonably drawn the inference that Flodquist's conduct with respect to Jones was different as a result of Jones' race because, as alleged in paragraph 44 of the Third Amended Complaint, the Town's official custom led Flodquist to believe that misconduct on his part would be tolerated with respect to African-American suspects, particularly in light of the fact that Flodquist was the officer involved in the Shane Gray incident.  As recognized by the court in <u>Bordanaro</u>, deliberate indifference to the rights of citizens "make[s] a constitutional violation 'almost bound to happen, sooner or later.'"  <u>Bordanaro</u>, 871 F.2d at 1157 (quoting <u>Spell</u>, 824 F.2d at 1391).

Accordingly, the court concludes that the Town's renewed motion for judgment as a matter of law should be denied because the jury could have reasonably concluded that the plaintiff established the existence of an official custom or practice that caused Jones to be subjected to the denial of a constitutional right.

## II.  PLAINTIFF'S MOTION FOR HEARING ON COMPENSATORY DAMAGES

The plaintiff has filed a "Motion for Hearing on Compensatory Damages", which includes a request for a new trial solely on the issue of compensatory damages.  For the reasons set forth below, that motion is being granted.

The plaintiff produced limited evidence on compensatory damages. For instance, there was no evidence as to lost earning capacity, or medical, hospital or funeral expenses. However, the plaintiff did introduce evidence in three areas. First, the plaintiff introduced evidence that Jones had a daughter, evidence that he lived with the mother of his daughter at times, and evidence as to his mother. The plaintiff also put into evidence a life expectancy chart, which established a life expectancy of 42.5 years; the parties stipulated that Jones had violated his state probation, that his probation officer would have recommended that he serve approximately two years in prison, and that the state court could have accepted the recommendation or increased or decreased the time. Second, it was undisputed that Jones lost his life. Third, there was evidence that four bullets entered Jones' body in five different locations and that he did not die immediately; although the defendants offered evidence as to the effect of the PCP found in Jones' body on pain, there was evidence that Jones was moaning after he was shot.

The court instructed the jury that the elements of injury or loss for which compensation may be awarded in this case were (I) compensation for the destruction of Jones' capacity to carry on and enjoy life's activities in the way he would have done had he lived, (ii) compensation for the loss of life itself, even if death had been instantaneous, and (iii) compensation for

conscious pain and suffering, including any emotional distress suffered by Jones.

The court instructed the jury that it must award nominal damages if it found that a defendant violated Jones' constitutional rights but that Jones suffered no injury as a result of the violation. Assuming a finding that Jones suffered a deprivation of his constitutional rights, the court further instructed the jury that either Jones suffered injuries that were unlawfully caused by one or more of the defendants, in which case the jury must award the plaintiff compensatory damages, or he did not suffer any injuries, in which case the jury must award the plaintiff nominal damages.

The jury concluded that the plaintiff had proven that defendant Flodquist violated Jones' constitutional rights by using excessive force against him, but was shielded from liability under the doctrine of qualified immunity. The jury concluded that the plaintiff had not proven that defendant DePalma violated Jones' constitutional rights by failing to intervene to protect Jones from the use of excessive force by Flodquist. It also concluded that the plaintiff had proven that Jones' constitutional rights were violated by defendant Flodquist as a result of an official practice or custom of the Town.[1]

---

[1] The jury also found that the plaintiff had not proven her claim for battery against defendant Flodquist, her claim for intentional infliction of emotional distress against defendant

The jury was asked to state whether the plaintiff had proven that Jones sustained injury or damage as a result of the wrongful conduct of a defendant who had been found liable to the plaintiff.  The first portion of Part VIII.A. of the verdict form read as follows:

> With respect to each of the defendants named below, has the plaintiff proven by a preponderance of the evidence that Mr. Jones sustained injury or damage as a result of the wrongful conduct of that defendant?

The jury answered "Yes" with respect to the Town.  The jury also answered "Yes" to that question with respect to defendant Flodquist even though the instruction for that part of the verdict form indicated that the jury should not respond to the question for any defendant the jury had concluded was not liable and the jury had concluded that Flodquist was shielded from liability by qualified immunity.

In Part VIII.B. of the verdict form, the jury was asked, if its answer was "Yes" as to any defendant in Part VII.A., to state the total amount of compensatory damages it determined to be fair, just, and reasonable.  On the line for compensatory damages, the jury wrote "0".  In Part VIII.C. of the verdict form, the jury was instructed that it must award nominal damages in the amount of $1 if it had not answered "Yes" in Part VIII.A. as to any of the defendants.  The jury left the space for nominal

---

Flodquist, or her claim for negligent infliction of emotional distress against defendants Flodquist and DePalma.

damages blank.

After consulting with counsel at sidebar, the court conducted a limited inquiry of the jury. The court confirmed that the jury understood that notwithstanding the fact that it had completed Part VIII.A. of the verdict form with respect to defendant Flodquist, he was shielded from liability by qualified immunity. In addition, the court confirmed with respect to the Town that the jury had concluded that the plaintiff had proven that there was injury or damage sustained, but the value the jury put on it was zero dollars, as opposed to awarding nominal damages of $1.

Citing to Wheatley v. Beetar, 637 F.2d 863 (2d Cir. 1980), the plaintiff argues that where liability has been established and damages are more than nominal, the plaintiff is entitled to a new trial on the issue of such damages where the jury failed to award them. In Wheatley, the court concluded that "the jury's rejection of Wheatley's other damages, namely the pain and suffering of the actual beating itself, is unsupportable." Id. at 866. The court stated further:

> But on this record we can only infer that, although the jury believed that Wheatley had been beaten, when it came time to award damages it acted on the basis of impermissible considerations, such as an unwillingness to give money to an admitted heroin addict and thief. Despite appellant's character and criminal record, however, he was entitled to be justly compensated for the physical abuse he received. It is clear that at least some actual injury was suffered, cf., Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (in

> the absence of any proof of actual injury from the
> constitutional violation found, nominal damages will be
> appropriate relief in 42 U.S.C. § 1983 actions), and a
> new trial on the issue of damages resulting from the use
> of force is thus required.

Id. at 867.  The jury's response in Part VIII.A. of the verdict

form makes it clear that, here also, some actual injury was

suffered.

The Town argues that the jury here could have properly

concluded that both justifiable and excessive force were

employed, that Jones' injuries arose from the application of the

justifiable force employed, and that consequently an award of no

compensatory damages was appropriate.  In support of the theory

on which the Town's argument is based, the Town properly cites to

Gibeau v. Nellis, et al., 18 F.3d 107 (2d Cir. 1994) and Haywood

v. Koehler, et al., 78 F.3d 101 (2d Cir. 1996).  In Gibeau, the

jury found that a corrections officer, Lytle, had used excessive

force against the plaintiff, but declined to award any damages.

However, prior to Lytle's use of excessive force, the plaintiff

had been involved in an altercation with another corrections

officer during which the other corrections officer struck the

plaintiff.  The court concluded that the plaintiff failed to

establish that his physical injuries were caused by Lytle.

However, the court directed the district court to amend the

judgment to award nominal damages to the plaintiff against Lytle.

In Haywood, the court concluded "that the jury could reasonably

have found that Haywood's injuries resulted from the use of force that was not excessive, and that the use of excessive force caused him no compensable injuries."  78 F.3d at 102.  It noted that "conflicting versions permitted the jury to find that Haywood's head injuries were sustained in the dayroom as a result of [defendant] Garcia's use of reasonable force to restore order, and that, after inflicting the injury, [defendant] Garcia, in the course of the continuing struggle, used physical force that was excessive but that caused no compensable injuries."  Id. at 105.

However, application in this case of the theory that was relevant to the decisions in Gibeau and Haywood is not supported by the jury's conclusions stated in the verdict form.  In Part VIII.A. of the verdict form, the jury, although it was not supposed to complete it with respect to defendant Flodquist, stated its conclusion that the plaintiff had proven by a preponderance of the evidence that Jones sustained injury or damages as a result of the wrongful conduct of Flodquist.  In light of that statement from the jury, which was confirmed by the court in its limited inquiry of the jury, one cannot infer that the jury concluded that while Flodquist used excessive force against Jones, the injury or damage sustained by Jones was the result of the use by Flodquist of some other force that was justifiable.

Quoting Curley v. Village of Suffern, 268 F.3d 65 (2d Cir.

2001), and Barrett v. Orange County Human Rights Commission, 194
F.3d 341 (2d Cir. 1999), the Town also argues that because
defendant Flodquist was found to be not liable based on the
doctrine of qualified immunity, the Town cannot be held liable
unless the plaintiff shows that the "alleged injuries are not
solely attributable to the actions of the named individual
defendants." Curley, 268 F.3d at 71. However, this argument is
based on a misreading of Curley and Barrett. In Curley, the
court explicitly stated that "case law further suggests [City of
Los Angeles v. Heller, 475 U.S. 796 (1986)] will not save a
defendant municipality from liability where an individual officer
is found not liable because of qualified immunity. See, e.g.,
Myers v. Okla. County Bd. of County Comm'rs, 151 F.3d 1313, 1317
(10th Cir. 1998); Barber v. City of Salem, 953 F.2d 232, 237-38
(6th Cir. 1992)." Curley, 268 F.3d at 65; see also Cowan v.
Breen, et al., 352 F.3d 756, 765 (2d Cir. 2003) ("Moreover,
because a municipality is not entitled to qualified immunity in
§ 1983 actions, Owen v. City of Independence, 445 U.S. 622, 638,
100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); Catletti v. Rampe, 334
F.3d 225, 227 n. 1 (2d Cir. 2003), even if [individual defendant]
Breen was entitled to qualified immunity, if Cooper's
constitutional rights were violated, the Town could still be
liable.").

The language quoted by the Town in support of its argument

comes from the following passage in <u>Curley</u>:

> Following <u>Heller</u>, we have recognized that a municipality cannot be liable for inadequate training or supervision when the officers involved in making an arrest did not violate the plaintiff's constitutional rights. <u>Amato v. City of Saratoga Springs</u>, 170 F.3d 311, 320 (2d Cir. 1999); <u>Ricciuti</u>, 124 F.3d at 132; <u>Dodd v. City of Norwich</u>, 827 F.2d 1, 8 (2d Cir. 1987) (on reargument, vacating prior panel opinion). <u>Heller</u> should not, of course, be applied indiscriminately. For example, where alleged injuries are not solely attributable to the actions of named individual defendants, municipal liability may still be found. <u>See Barrett v. Orange County Human Rights Comm'n</u>, 194 F.3d 341, 350 (2d Cir. 1999).

<u>Curley</u>, 268 F.3d at 71. Thus, the Town's argument stands on its head the court's analysis in <u>Curley</u>. The same is true with respect to <u>Barrett</u>, where the court stated that "it is therefore possible that a jury could find the Commission and the County of Orange liable for the alleged violations of Barrett's First Amendment rights even after finding that Lee and Colonna are not liable", <u>Barrett</u>, 194 F.3d at 350, thus recognizing that it was possible that while the named individual defendants did not violate the plaintiff's constitutional rights, the Commission did.

Finally, the defendant argues that during the discussion of the verdict form at sidebar, the plaintiff explicitly accepted and ratified that jury's failure to award compensatory damages, repeatedly defending as correct the jury's award of zero dollars in compensatory damages. However, the transcript of the sidebar conference reflects that first, the court first expressed a

concern about whether, in view of the jury's response to Part
VIII.A. of the verdict form, the jury could properly answer "0"
in Part VIII.B.; the court expressed a view that if the answer
was zero dollars with respect to compensatory damages, then $1 in
nominal damages had to be awarded.  The court then asked whether
there could ever be compensatory damages of zero dollars, at
which point plaintiff's counsel said it was possible.  Defense
counsel subsequently commented, _inter_ _alia_, that the jury should
have indicated zero dollars in compensatory damages and $1 in
nominal damages.  Plaintiff's counsel then observed that he
thought what the jury was saying was that the plaintiff had not
proven any compensatory damages; the court noted that that would
be the equivalent of awarding nominal damages, a point with which
plaintiff's counsel agreed.  The court then conducted its limited
inquiry of the jury.

In response to the court's inquiry, the jury confirmed that
the plaintiff had proven by a preponderance of the evidence that
Jones sustained injury or damage as a result of wrongful conduct
and it understood that with respect to defendant Flodquist,
although it had answered "Yes" in Part VIII.A., Flodquist was
shielded from liability.  With respect to the Town, the jury
confirmed that although it had been proven that Jones had
sustained injury or damage, the value it put on that injury or
damage was zero dollars.  Thus, notwithstanding the discussion at

94

sidebar, it was clear that the jury's conclusions did not support an award of nominal damages, but rather one of compensatory damages.  In light of how the discussion at the sidebar unfolded and the jury's subsequent responses to the inquiry of the court, the court does not conclude that the plaintiff waived her right to argue that an award of zero dollars in compensatory damages was contrary to the evidence and the law.

Accordingly, the court concludes that the plaintiff's motion for a new trial on the issue of compensatory damages should be granted pursuant to Fed. R. Civ. P. 59(a).

**PART III: TOWN'S MOTION TO SET ASIDE AWARD OF PUNITIVE DAMAGES**

The Town has moved to set aside the award of punitive damages against it.  For the reasons set forth below, that motion is being granted.

In <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247 (1981), the Supreme Court held that "a municipality is immune from punitive damages under 42 U.S.C. § 1983" (<u>id.</u> at 271), but observed in footnote 29 of the opinion that "[i]t is perhaps possible to imagine an extreme situation where the taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights."  (<u>Id.</u> at 267 n. 29).  In <u>Ciraolo v. City of New York</u>, 216 F.3d 236, 240 (2d Cir. 2000), the court observed that "[t]o the extent that footnote 29 creates an exception to

<u>Newport's</u> general rule against punitive damages, therefore, it is
. . . an exception for outrageous abuses for which the taxpayers
are directly responsible."  Here, the evidence at trial "cannot
suffice to place this case within the seemingly narrow exception
carved out by footnote 29."  <u>Id.</u> at 242.

The Third Amended Complaint originally named Chief Criscuolo
in both his individual and official capacities.  At the final
pretrial conference, the plaintiff agreed that there was no
individual capacity claim against Chief Criscuolo, leaving only
the official capacity claim.  Chief Criscuolo's name was then
omitted from the caption of the case in the documents that were
submitted to the jury.  During the charge to the jury, the jury
was informed that the plaintiff had also asserted the <u>Monell</u>
claim against Chief Criscuolo in his official capacity, but that
the claim was in substance the same claim as the claim against
the Town, so the court was simply referring to a claim against
the Town.

Against this backdrop, the plaintiff argues that the only
supervisory official from the EHPD who was named as a defendant
was Chief Criscuolo, that the reasonable inference to be drawn
from the jury's verdict is that it was directed against Chief
Criscuolo, and that assessing punitive damages against the Town
was the only manner in which the jury could assess them against
Chief Criscuolo in his official capacity.  This argument fails

because "a section 1983 action against a city official in his or her official capacity is treated as an action against the City entity itself." Barber v. City of Salem, Ohio, 953 F.2d 232, 237 (6th Cir. 1992); see also Hafer v. Melo, 502 U.S. 20, 25 (1991) ("official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (citations omitted); DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998) ("We note that this suit, since it is brought against DuRose in his official capacity, is equivalent to a suit against OCDSS and Oneida County."); Fago v. City of Hartford, No. Civ. 3:02CV1189AHN, 2006 WL 860126, at *5 n. 5 (D. Conn. Mar. 31, 2006) ("a § 1983 suit against a municipal officer in his official capacity is considered a suit against the municipality itself").

The plaintiff also argues that the Town failed to timely object pursuant to Fed. R. Civ. P. 51. However, the court finds persuasive the analysis in Chestnut v. City of Lowell, 305 F.3d 18 (1st Cir. 2002) (en banc), where the court applied plain error analysis after the municipality failed to timely object to a jury charge on punitive damages.

Accordingly, the court concludes that the Town's motion to vacate the award of punitive damages against it should be granted.

## IV. PLAINTIFF'S BATSON CLAIMS

During the jury selection process, the plaintiff raised a
Batson claim to each exercise of peremptory challenge by the
defense.  In Barnes v. Anderson, et al., 202 F.3d 150 (2d Cir.
1999), the court summarized the framework for analyzing a Batson
claim:

> Batson, extended to civil cases by Edmonson v. Leesville
> Concrete Co., Inc., 500 U.S. 614, 630, 111 S.Ct. 2077,
> 114 L.Ed.2d 660 (1991), directs courts to apply a three-
> step, burden-shifting analysis to determine whether a
> peremptory strike has been exercised in a racially
> discriminatory manner:
>> When a Batson challenge is raised, the trial court
>> must decide
>>> (1) whether the [movant] has made a prima
>>> facie showing that the [non-movant] has
>>> exercised its peremptory strike on the basis
>>> of race,
>>> (2) if so, whether the [non-movant] has
>>> satisfied its burden of coming forward with a
>>> race-neutral explanation for striking the
>>> juror in question, and
>>> (3) if so, whether the [movant] has carried
>>> his burden of persuasion of proving purposeful
>>> discrimination.

Barnes, 202 F.3d at 155 (citations omitted).  A court must make
"a finding with respect to the proffered explanation for each
challenged strike . . . ."  Id. at 156.

The court found that the plaintiff had carried her burden of
persuasion on one of the four Batson claims.  Each side
strenuously objected to the findings that were not in its favor.
So the record is clear, the court summarizes here the rationale
for its findings on the plaintiff's Batson claims.

98

The members of the jury panel had been given a written list of questions and were required to answer each question "Yes" or "No" prior to being questioned by the court and counsel at sidebar.  Two of those questions have particular significance for purposes of discussion of the Batson claims.  Question No. 3 asked "Have you or anyone close to you ever been (a) arrested, or (b) charged with, convicted of, or investigated concerning, a criminal offense, including minor traffic violations?  Question No. 6 asked "Have you, or anyone close to you, ever had an unpleasant or unsatisfactory experience with a law enforcement officer?"

After being questioned at sidebar, 19 members of the jury panel were seated in the expanded jury box.  Each juror had a three-digit number, but for the purposes of this summary, the jurors are referred to as Juror Nos. 1 through 19, based on the seat numbers in which they were placed.

The plaintiff challenged two jurors for cause, Juror Nos. 10 and 17.  The defense challenged four jurors for cause, Juror Nos. 1, 2, 7 and 12.  The court denied all the challenges for cause. At that point, because the parties had agreed on a jury of nine and each side had three peremptory challenges, the parties were working with Juror Nos. 1 through 15.  Juror Nos. 1, 2 and 7 were

understood to be African-American[2] and Juror No. 11 was Hispanic. The 11 other jurors in the first 15 seats were white.

When it came time to exercise peremptory challenges, the defendants were asked to strike two individuals and they identified Juror No. 1 and Juror No. 2, both of whom were understood to be African-American. The plaintiff made a <u>Batson</u> claim with respect to both peremptory challenges. The process continued and the defendants struck Juror No. 7 with their third peremptory challenge. The plaintiff again made a <u>Batson</u> claim. At that point, there were four persons of color out of the 15 individuals under consideration, or 26.6 percent, and the defendants had used 100 percent of their peremptory challenges to strike persons of color, all of them African-American. At that point, the rate of challenges to minorities supported a statistical inference of discrimination, and the court concluded that the plaintiff had shown that there was a <u>prima</u> <u>facie</u> case sufficient to require the defendants to give a race-neutral explanation. <u>See</u> <u>United States v. Alverado</u>, 923 F.2d 253, 255-56 (2d Cir. 1991) ("Only a rate of minority challenges significantly higher than the minority percentage in the venire would support a statistical inference of discrimination . . . We think a

---

[2] Juror No. 1 was actually a dark-skinned Hispanic individual, but counsel took him to be African-American and agreed for purposes of the discussion of the <u>Batson</u> claims that he was.

challenge rate nearly twice the likely minority percentage of the venire strongly supports a <u>prima</u> <u>facie</u> case under <u>Batson</u>.")

After discussing the defendants' explanations for the exercise of their peremptory challenges, the court decided to adjourn jury selection so that it could review a transcript of the proceedings.  The court met with counsel and called the potential jurors back a few days later.

The court found that the plaintiff had not carried the burden of persuasion with respect to Juror No. 1.  Although the court was satisfied the juror could be fair and impartial, based on the fact that the juror had had several experiences where he had been stopped by police officers and thought he had been treated fairly, the juror also stated that he had been stopped by a police officer in a white neighborhood because of his race.  During that incident, the juror was told he had been stopped for not having a front license plate.  He believed that white motorists had also been driving by without a front license plate, so he told the officer he was going to stay around and watch to see if the officer stopped everyone else who did not have a front license plate, after which the officer stopped white motorists who did not have front license plates.  Juror No. 1 conceded that he did not know who the officer had stopped prior to stopping him.  Although Juror No. 1 believed the incident involved racial bias, he did not think he could have proved racial bias.  In

addition, Juror No. 1 had been stopped on several occasions for speeding, sometimes by white officers, and he thought he had been treated fairly during those incidents, as well as during another incident where he had been arrested and fined. The defendants explained that they chose to exercise a peremptory challenge against Juror No. 1 because no other potential juror had stated that he or she had been subjected to racial discrimination by police officers in connection with a motor vehicle stop in a white neighborhood, and that claim was at issue in this case. Under all the circumstances, the court found that explanation to be plausible.

The court also found that the plaintiff had not carried the burden of persuasion with respect to Juror No. 2. Juror No. 2 responded "Yes" to Question No. 3. However, based on the discussion at sidebar, she should have also responded "Yes" to Question No. 6. Juror No. 2 had had two experiences with police officers. On one occasion, she was stopped for speeding by a police officer, who was white. She did not have any concerns about the situation. She felt that the officer was simply doing his duty. On a second occasion, however, Juror No. 2 was stopped during a blizzard and given a ticket when she was driving home from work by a police officer who claimed the juror had run a stop sign, which she had not. Juror No. 2 reported that the officer, who was white, was very rude to her and gave her a $200

ticket for not having her driver's license with her. The juror
sent a letter to the Department of Motor Vehicles with a check
paying the fine, and her money was sent back to her. Juror No. 2
was very unhappy about the situation and stated that there could
have been racial overtones to this second situation. The
defendants explained their reason for exercising the peremptory
challenge against Juror No. 2 as concern that she had had an
experience somewhat similar to those at issue in the case, and
she was very upset about it, thought the officer had harassed
her, and believed that the incident could have been racially
motivated.

The court evaluated the Batson claim with respect to Juror
No. 2 in light of responses given by Juror No. 12 during the jury
selection process. Juror No. 12 answered "Yes" to, inter alia,
Question No. 3 and Question No. 6. Juror No. 12 had been stopped
by police officers on numerous occasions for motor vehicle
violations, and when he was younger, had a number of points on
his license. His view of the police officers who gave him
tickets was that some were good and some were bad. When asked
whether, going into the trial, his view of police officers was
favorable or unfavorable, Juror No. 12 stated that he had mixed
opinions. During the discussion at sidebar concerning challenges
for cause, the defendants stated that they had an overall
impression that Juror No. 12 had a negative view of police

officers because of his own experiences.  On the second day of jury selection, the court explained that it had concluded, based on the defendants' explanation, that striking Juror No. 2 was at least as plausible as striking Juror No. 12.

Juror No. 7 was the subject of the defendants' third peremptory challenge.  On the second day of jury selection, in the context of the plaintiff's Batson claim with respect to the defendants' exercise of a peremptory challenge to strike Juror No. 7, the plaintiff discussed Juror No. 11 and Juror No. 12. The points raised with respect to Juror No. 12 are covered by the discussion above.  Juror No. 11 answered "Yes" to, inter alia, Question No. 6.  Juror No. 11, who was Hispanic, reported that his son had had an unpleasant or unsatisfactory experience with a police officer.  His son had been out playing sports and broken an ankle and was driving home to get his wallet and insurance card so that he could go to a hospital.  The son was stopped by a police officer who gave him a ticket even though he explained the extenuating circumstances.  Juror No. 11 thought his son was treated unfairly.  Juror No. 11 also reported that a very good friend and neighbor, who was a police officer in Puerto Rico, was killed in the line of duty.  The juror reported that the only unpleasant experience he or anyone in his family had had with a police officer was the incident involving his son, and that the juror had had no favorable experiences with police officers.

During the discussion about Juror No. 7 on the second day of jury selection, the plaintiff pointed by way of contrast to Juror No. 11 and Juror No. 12 as individuals who had had negative experiences with police officers, yet had not been the subject of a peremptory challenge by the defense, even though the defendants had contended in explaining the exercise of their first two peremptory challenges that negative experiences with police officers where there were similarities to this case was an important consideration in exercising the challenges.

Juror No. 7 had also been challenged by the defendants for cause. Juror No. 7 answered "Yes" to Question No. 3 and "No" to Question No. 6. As to Question No. 3, Juror No. 7 stated that she had six adult children, and that two or maybe three of them had been arrested. She did not know when they got arrested. She knew what town they had been arrested in and where they lived, but the arrests occurred after they had moved out of her house. Her children were in their thirties and forties, and they had never told her that anything bad had happened to them in terms of how they were treated by the police. Juror No. 7 stated that she guessed the officers had to do their jobs and if they were fair, they were doing their jobs. Juror No. 7 also reported that a daughter had been a crime victim and the officers who dealt with the juror at the time of that crime treated her very well; the officers were white.

The defendants inquired about Juror No. 7's connection with the "Urban League." The juror was in a senior citizen's program and worked part time at a local store through a program of the Urban League of Greater Hartford, as opposed to working at the office of the Urban League of Greater Hartford. In 1997, Juror No. 7 was working for the post office, having just been laid off by an insurance company. She had had no contact with the Urban League until approximately nine months prior to jury selection. She did not know when the Jones' shooting had occurred, and she was not aware of what position, if any, any affiliate of the National Urban League had taken on the case.

In making their challenge for cause, the defendants expressed a concern about whether the Urban League was one of the organizations that had participated in marches and demonstrations demanding the firing and prosecution of Officer Flodquist. The defendants could not represent that the Urban League was one those organizations. The plaintiff represented that the Urban League of Greater Hartford, through which Juror No. 7 had obtained her job placement, had not been involved.

When the defendants were asked to give the reason for exercise of the peremptory challenge with respect to Juror No. 7, they stated that parents sometimes have very negative feelings toward police who arrest and incarcerate their children. The court found that the plaintiff had carried the burden of

persuasion with respect to Juror No. 7.  In explaining their exercise of their first two peremptory challenges, the defendants had emphasized their concern about people who had had negative experiences with police officers that would or could cause them to have a bias against police officers.  The greater the extent to which those negative experiences involved situations similar to those at issue in this case, the greater that concern appeared to be on the part of the defendants.  The court observed that it had followed the rationale for the exercise of the other peremptory challenges by the defendants and, in light of the record, could see that rationale applying to not only Juror No. 1, but also to Juror No. 2, Juror No. 5, Juror No. 6, Juror No. 11 and Juror No. 12, but could not see that rationale applying to Juror No. 7.  The court concluded that there had been a change in the defendants' approach when it came time to exercise the third peremptory challenge, and that there had been no satisfactory explanation proffered, given the fact that Juror No. 12 had been passed over by the defendants.

After the court ruled on the <u>Batson</u> claim with respect to Juror No. 7, it gave the defendants the opportunity to exercise another peremptory challenge.  The defendants exercised that peremptory challenge against Juror No. 11, the only Hispanic juror in the group of 15.  The court confirmed that the plaintiff was making a <u>Batson</u> claim with respect to Juror No. 11 and then

informed the parties that the plaintiff had not carried her burden of persuasion. At that point, the court merely made a general reference to its earlier analysis. That earlier analysis was the court's analysis with respect to Juror No. 7. In connection with its consideration of Juror No. 7, the court had accepted the defendants' rationale for striking potential jurors who had or should have answered "Yes" to Question No. 6. The court had concluded that Juror Nos. 1, 2, 5, 6, 11 and 12 were all jurors that could reasonably be struck applying that rationale. In addition, the court had in mind the argument made earlier by the plaintiff that Juror Nos. 11 and 12 had had negative experiences with police officers and would be struck before Juror No. 7 if that was what the defendants were genuinely concerned about. In response, the defendants had commented that they were not particularly happy about having Juror Nos. 11 and 12 either. Thus, although the court did not ask the defendants to articulate their reason for exercising the fourth peremptory challenge against Juror No. 11, the court believed it understood what that reason was and had, prior to the defendants' exercise of that peremptory challenge, concluded that Juror No. 11 was among a group of individuals as to whom exercise of the fourth peremptory challenge would have been consistent with the rationale employed by the defendants in striking Juror Nos. 1 and 2. Therefore, the court concluded that the plaintiff had not

carried her burden of persuasion with respect to Juror No. 11.

## V.   CONCLUSION

For the reasons set forth above, the Town's Motion for Judgment as a Matter of Law (Doc. No. 156) is hereby DENIED; the plaintiff's "Motion for Hearing on Compensatory Damages," which includes a request for a new trial solely on the issue of compensatory damages (Doc. No. 162-2) is hereby GRANTED; and the defendants' Motion to Set Aside Jury's Award of Punitive Damages Against the Town of East Haven (Doc. No. 154) is hereby GRANTED.

It is so ordered.

Dated this 6th day of July 2007 at Hartford, Connecticut.

_____/s/AWT_____
Alvin W. Thompson
United States District Judge
